(No. 58631.—

## *In re* MARRIAGE OF KATE C. LOGSTON, Appellee, and EUGENE C. LOGSTON, Appellant.

*Opinion filed September 20, 1984.*

Richard G. Reed, P.C., of Belleville (Richard G. Reed and Rodney W. Thompson, of counsel), for appellant.

Angelia Blackman-Donovan, of Belleville, for appellee.

CHIEF JUSTICE RYAN delivered the opinion of the court:

The central issue in this case is whether our personal

property exemption statute (Ill. Rev. Stat. 1983, ch. 110, par. 12—1001) constitutes a defense to a contempt order that was issued to enforce a maintenance obligation in a dissolution-of-marriage case. Eugene Logston appeals from orders of the circuit court of St. Clair County that were issued during proceedings instituted by his former wife, Kate Logston. To enforce the maintenance provision of their dissolution-of-marriage judgment, Kate initiated contempt proceedings against Eugene. Eugene answered Kate's petition for rule to show cause and at the same time filed a petition that sought termination of the maintenance payment. In a March 1983 order, the trial court determined a maintenance arrearage, entered judgment for that amount, and found Eugene in contempt of court for his failure to pay. The court also denied Eugene's request to modify the maintenance award.

Eugene filed a motion to reconsider this order. As a defense to the contempt finding, he claimed that all of his monthly income—which consists of social security, a private pension, and a disability insurance benefit—is exempt from judgment under section 12—1001 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 12—1001). The statute he cited exempts specific personal property, as well as a debtor's right to receive certain types of income, from "judgment, attachment or distress for rent." In an order issued in May 1983, the trial court rejected this defense, denied Eugene's motion to reconsider, and held that section 12—1001 is invalid because its phrase "exempt from judgment" is unconstitutionally vague. Because a statute of this State was held to be invalid, Eugene appealed directly to this court pursuant to Rule 302(a)(1) (87 Ill. 2d R. 302(a)(1)).

He now raises three issues for our review. The first is whether section 12—1001 of the Code of Civil Procedure constitutes a valid defense to the contempt order. The second question is whether the trial court abused its

discretion when it found wilful failure to pay maintenance and, as a result, held Eugene in contempt. Finally, we must decide whether the trial court abused its discretion by denying Eugene's request to terminate the maintenance obligation.

Eugene and Kate Logston were married in 1966, and they resided together until eight months before their marriage was dissolved in January 1981. No children were born during the marriage. At the time of the divorce, Eugene was 52 years old and had been retired, due to poor health, for four years. Kate was 50 years old and had not worked since 1974.

Just before the dissolution of marriage, the Logstons owned their marital home, the house next door, and one vacant lot. Their total equity in the real estate was $42,000. They also owned stock valued at $800, automobiles, and various home furnishings. Kate had no income, and Eugene received a total of $813.32 per month in payments from social security, a private pension, and disability insurance.

The dissolution-of-marriage judgment allowed each party to keep the furnishings, automobile, and personal effects that were in his or her possession at the time the judgment was entered. Kate was awarded the stock, but she retained no interest in Eugene's right to receive pension or disability benefits. Instead, Eugene was ordered to pay her $221.50 per month as maintenance, which is the same monthly amount that the court had ordered him to pay as temporary maintenance in December 1980. Of the $42,000 equity in real property, the parties agreed that Kate would pay $21,000 to Eugene in exchange for quitclaim deeds conveying to her his interest in the property. Kate was allowed to deduct from the $21,000 certain sums that Eugene owed her, so her actual payment to him was $16,887.

From December 1980 through May 1983, Eugene

paid no maintenance to Kate. However, in August 1981, the trial court found a $1,993.50 arrearage, which represented two months of the predissolution temporary maintenance and seven months of the permanent maintenance. The court reduced this amount to judgment, and, during the next year, a total of $1,937.40 was paid to Kate through garnishment proceedings against Eugene's disability insurer. When the court issued the May 1983 order from which Eugene now appeals, the total arrearage had grown to $4,707.60, with Eugene being ordered to either pay $4,043.10 within 30 days or serve a jail sentence of not more than six months.

At the time of the hearing, Eugene was still unable to work. He had remarried, and his new wife taught school but would soon retire. For the present, however, she earned a net monthly income from teaching of $1,457, plus an average of $85 per month from part-time work. Eugene resided with her in a house that she owned.

Eugene's petition, as well as his answers to interrogatories, indicate that his income had decreased since his divorce from Kate. However, further examination during the hearing disclosed that his monthly income actually had increased since the dissolution of marriage and now totaled $922.44.

Eugene's financial statement indicates that, at the time he petitioned to modify the maintenance, he owned no real estate but did possess a small amount of cash and $500 of equity in a motorcycle. He had owned a 1978 Chevrolet truck, valued at under $3,000, but had signed the title over to his present wife to help her obtain a loan for a recreational vehicle. Concerning the $16,887 that Kate paid him for his interest in their real estate, he testified that he used about $5,500 to repay debts and spent the remainder during a trip to California.

The financial statement shows that Eugene reported monthly expenses of $80 for rent; $185 for utilities; $365 for automobile expenses; $150 for food; $70 for clothing and laundry; and $160 for recreation, gifts, hobbies, and the costs of volunteer work. The statement also lists monthly obligations on installment contracts which total $816.47. During Eugene's testimony at the hearing, it became apparent that some monthly expenses that he had listed on his written financial statement were costs shared with his present wife, rather than expenses that he alone incurred each month. His testimony revealed that the $816.47 in monthly installment obligations represented payments on an automobile, a motorcycle, a recreational vehicle, and a $7,500 loan obtained to remodel his wife's kitchen. The trial judge and both parties' counsel questioned Eugene about these expenses, but his responses failed to clarify whether he actually paid each of these amounts each month or whether, instead, his wife shared or fully paid the installment debts. Eugene testified to extensive health problems. However, his responses to cross-examination revealed that health insurance fully paid his hospital expenses, and that Medicare paid a portion of his other medical and dental costs.

When Kate Logston testified, she was unemployed and had not worked since her divorce from Eugene. She still owned the two houses; her invalid mother lived with her in one, and for the other she received $350 per month in rent. Mortgage and insurance costs for the houses, which Kate had reported as $300 just before the divorce, now totaled $360. She testified that her mother received a $600 monthly pension, which was available to help Kate pay expenses. Because her mother required extensive care, Kate could not obtain a job that would require her to leave home for more than a few hours at a time. Kate conceded, however, that she had not sought work that she could do in her home.

We first address section 12—1001 of our Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 12—1001) and the question whether Eugene may use the exempt status of his income as a defense to the contempt order. Eugene contends that the order will force him to pay maintenance from income that the legislature intended to protect for the debtor's benefit. In his view, the trial court used its contempt power as an alternate means of enforcing Kate's judgment for the maintenance arrearage. Eugene therefore insists that the contempt order, if enforced, will circumvent the legislative scheme. Kate responds that the exemption statute, with its phrase "exempt from judgment," is unconstitutionally vague and, as such, is not a defense to the contempt order. Alternatively, she claims that section 12—1001 simply does not apply to a marital obligation set out in a dissolution-of-marriage judgment.

Examining the statute itself, we see that section 12—1001 indeed refers to each source of Eugene's income:

"The following personal property, owned by the debtor, is exempt from judgment, attachment or distress for rent:

\* \* \*

(g) The debtor's right to receive:
(1) a social security benefit \*\*\*;
\*\*\*

(3) a disability, illness, or unemployment benefit;.
\*\*\*

(5) a payment under any pension plans or contracts, to the extent necessary for the support of the debtor and any dependent of the debtor \*\*\*."
(Ill. Rev. Stat. 1983, ch. 110, par. 12—1001.)

Since Eugene's social security, pension, and disability insurance benefits are clearly listed in the statute, we must decide whether the language protects against a

contempt order issued to enforce a maintenance obligation. As noted below, the ambiguity of the words "exempt from judgment" used in section 12—1001 can be resolved through statutory construction. Therefore, section 12—1001 is not so vague as to violate constitutional principles of due process, which was the basis for the trial court's decision.

As often stated, the primary rule of statutory construction is to ascertain and effectuate the legislature's intent. In doing so a court looks first to the statutory language itself. If the language is clear, the court must give it effect and should not look to extrinsic aids for construction. (*People v. Boykin* (1983), 94 Ill. 2d 138, 141; *Vause & Striegel, Inc. v. McKibbin* (1942), 379 Ill. 169, 175.) With this in mind, we consider section 12—1001 and its phrase, "exempt from judgment."

The term "exempt" presents no interpretation problem. Exempt property is that which is free from liability to processes such as seizure and sale, or attachment, to satisfy debts. (35 C.J.S. *Exemptions* sec. 1, at 6 (1960); 19 Ill. L. & Prac. *Exemptions* secs. 1, 2 (1956).) Legislative intent is unambiguous insofar as section 12—1001 "exempts" specified property from certain proceedings against the debtor.

The legislature's intent is not so clear, however, with respect to its use of the word "judgment." Standing alone as a legal term, "judgment" has a well-settled definition. It is a court's official decision with respect to the rights and obligations of the parties to a lawsuit. (See Ill. Rev. Stat. 1983, ch. 110, par. 2—1301(a); *People ex rel. Schwartz v. Fagerholm* (1959), 17 Ill. 2d 131, 134.) A judgment, of course, may require one party to pay money to another. This money judgment, however, only states that a party must pay a particular sum. The judgment does not specify the income or property from which the judgment debtor must satisfy the obligation.

If the judgment goes unpaid, it may be enforced through the remedy of execution, whereby as much of the debtor's property may be taken and sold as is necessary to satisfy the obligation. (Ill. Rev. Stat. 1983, ch. 110, pars. 12—112 through 12—115, 12—158; see generally 33 C.J.S. *Executions* sec. 1 (1942).) Until the execution process begins, however, "[n]o judgment shall bind the goods and chattels of the person against whom it is entered." (Ill. Rev. Stat. 1983, ch. 110, par. 12—111.) Thus, while a money judgment concerns the parties' rights and obligations, it cannot of itself attach to a particular item of the judgment debtor's property.

In this way, a money judgment differs from attachment and distress for rent, processes from which section 12—1001 also exempts a debtor's property. Attachment is a remedy by which a defendant's property is secured and held to satisfy a debt that the plaintiff hopes to prove (see Ill. Rev. Stat. 1983, ch. 110, pars. 4—101, 4—105, 4—110; 7 C.J.S. *Attachment* sec. 2(a) (1980)), while distress for rent denotes a landlord's right to seize a tenant's property in lieu of unpaid rent (see Ill. Rev. Stat. 1983, ch. 110, pars. 9—301 through 9—321; Black's Law Dictionary 426 (5th ed 1979)). Since attachment and distress for rent are both proceedings against property, the legislature's intent is clear insofar as section 12—1001 exempts certain property from these processes. But with respect to a money judgment, which concerns property only indirectly, the legislative purpose is more obscure.

The word "judgment" in section 12—1001 may reflect an intent that exempt property be immunized only from particular proceedings that are used to enforce an unpaid judgment. On the other hand, the intent may have been more favorable to the debtor, so as to encompass the position that Eugene urges in the case at bar. That is, that a court may not use its contempt power to enforce a maintenance obligation when the debtor has only

exempt property with which to purge himself of contempt.

When, as here, a statute is susceptible of two interpretations, it becomes proper to examine sources other than its language for evidence of legislative intent. The legislative history of the statute in question of course is relevant. (*People v. Boykin* (1983), 94 Ill. 2d 138, 141.) The reason for enactment, the circumstances that led to adoption, and the end to be achieved are all properly considered. (*Kerner v. State Employees' Retirement System* (1978), 72 Ill. 2d 507, 512; *Follett's Illinois Book & Supply Store v. Isaacs* (1963), 27 Ill. 2d 600, 604.) Where an amendment is concerned, a court will note the statutory language before the change and the defect to be corrected before weighing the entire statute in light of these considerations. *Arview v. Industrial Com.* (1953), 415 Ill. 522, 526.

Looking first to the history of personal property exemption statutes in general, we see that all property of the debtor was subject to execution at common law. American legislatures viewed the debtor with more compassion, however, and, as a result, all 50 States now have enacted personal property exemption statutes. (Comment, *Personal Property Exemptions and the Uniform Exemptions Act,* 1978 B.Y.U. L. Rev. 462, 462.) In 1843, the Illinois legislature adopted the predecessor to section 12—1001, the provision that we now examine. (See Ill. Rev. Stat. 1845, ch. 57, par. 33; *Good v. Fogg* (1871), 61 Ill. 449, 450.) As the policy underlying that early enactment, this court cited "the humane principle, that a creditor should not wholly deprive the husband and father of the means of supporting his family, usually helpless in themselves, and preventing them from becoming a public charge." (*Good v. Fogg* (1871), 61 Ill. 449, 451.) Much the same purpose is attributed to exemption legislation today (see 35 C.J.S. *Exemptions* sec.

1, at 8-9 (1960 & Supp. 1984)), with the debtor, his family, and the community being viewed as the intended beneficiaries of such statutes (*In re Schriar* (7th Cir. 1960), 284 F.2d 471, 473-74; *General Finance Corp. v. Rainer* (1958), 20 Ill. App. 2d 192, 195; Comment, *Personal Property Exemptions and the Uniform Exemptions Act,* 1978 B.Y.U. L. Rev. 462, 466).

From 1843 until quite recently, the Illinois personal property exemption statute underwent occasional changes (see Ill. Ann. Stat., ch. 52, par. 13, Historical Note, at 109-10 (Smith-Hurd 1967)) but maintained the same basic format. It allowed the debtor to keep certain named items, such as clothing and family pictures, as well as specified dollar amounts of other personalty. (See Ill. Rev. Stat. 1981, ch. 110, par. 12—1001; Ill. Rev. Stat. 1845, ch. 57, par. 33; *Good v. Fogg* (1871), 61 Ill. 449, 450.) As originally enacted, the statute exempted property from "levy and sale on any execution, writ of attachment, or distress for rent." (Ill. Rev. Stat. 1845, ch. 57, par. 33.) Under a later version which was in force from 1877 to 1979, property was exempt from "execution, writ of attachment and distress for rent." Ill. Rev. Stat. 1977, ch. 52, par. 13.

In 1978, however, during an overall effort to modernize Illinois statutes, a legislative development began that is pertinent to the case at bar. First, the legislature abolished the use of common law writs in Illinois practice. Certified copies of orders and judgments for the payment of money would now replace documents such as writs of execution and attachment. 1978 Ill. Laws 816; Ill. Rev. Stat. 1979, ch. 110, par. 601(a); Ill. Rev. Stat. 1983, ch. 110, par. 2—1501.

Consequently, the legislature amended a series of civil practice statutes to eliminate all references to writs. (Fins, *The Illinois Law Revision Commission*, 29 DePaul L. Rev. 443, 451-52, 454-55 & n.75 (1980).) One

such amendment affected the personal property exemption statute, so that property which before was exempt from "execution, writ of attachment and distress for rent," now was exempt from "judgment, attachment or distress for rent." This amendment also changed the title of the Act, which since 1877 had been "An Act to exempt certain personal property from attachment and sale on execution, and from distress for rent." The new title is "An Act to exempt certain personal property from attachment and sale for the enforcement of judgment and from distress for rent." (1979 Ill. Laws 1314, 1314-15, 1317; Ill. Rev. Stat. 1979, ch. 52, par. 13; Ill. Rev. Stat. 1983, ch. 110, par. 12—1001.) The legislature apparently regarded these technical changes as uncontroversial, since both chambers routinely passed the amendment without discussion. See H.B. 0047, 81st Ill. Gen. Assem., 1979 Sess., 1979 Senate Debates, June 15, 1979, at 4; 1979 House Debates, April 5, 1979, at 65, and April 9, 1979, at 3-4.

One later amendment also relates to the issue that we now address. In response to developments in Federal bankruptcy law, the Illinois legislature in 1981 altered the basic format of the personal property exemption statute. The Bankruptcy Reform Act of 1978 (11 U.S.C. sec. 101 *et seq.* (1982)) had increased the relief available to individual debtors by granting several Federal bankruptcy exemptions (11 U.S.C. sec. 522(d) (1982)). The States, however, could deny their residents the benefit of these exemptions by enacting "opt out" legislation. (11 U.S.C. sec. 522(b)(1) (1982).) In 1980, the Illinois legislature chose to opt out of the Federal exemption scheme and restrict our residents to exemptions granted by Illinois law. (See Ill. Rev. Stat. 1983, ch. 110, par. 12—1201; see generally Comment, *Bankruptcy Exemptions: Whether Illinois's Use of the Federal "Opt Out" Provision Is Constitutional,* 1981 S. Ill. U.L.J. 65, 65-70.)

Shortly thereafter, likely because the existing Illinois provisions "pale[d] in comparison to the federal bankruptcy exemptions" (Comment, *Bankruptcy Exemptions: Whether Illinois's Use of the Federal "Opt Out" Provision Is Constitutional,* 1981 S. Ill. U.L.J. 65, 69; see also Gov. James R. Thompson, Amendatory Veto Message to the Senate of August 20, 1981, 82d Ill. Gen. Assem., S.B. 300), our legislature endeavored to expand Illinois exemptions, including those for personal property (S.B. 300, 82d Ill. Gen. Assem., 1981 Sess., 1981 House Debates, June 27, 1981, at 307-09).

After amendment, section 12—1001 no longer exempted only a few personal possessions and finite amounts of other personalty. It now also exempted the debtor's right to receive certain types of income, such as the social security, pension, and disability insurance benefits that are at issue in the case at bar. (1981 Ill. Laws 3629, 3632-34.) Only the House of Representatives debated this amendment, and its discussion focused on changes to the homestead exemption provisions (Ill. Rev. Stat. 1983, ch. 110, pars. 12—901 through 12—912). The legislators did not mention whether the expanded exemptions would affect maintenance and support obligations, and the changes to the personal property provision were not discussed at all. See S.B. 300, 82d Ill. Gen. Assem., 1981 Sess., 1981 Senate Debates, April 1, 1981, at 2, and May 12, 1981, at 20-21; 1981 House Debates, June 23, 1981, at 191-99, and June 27, 1981, at 307-09.

This legislative history reveals that, before the amendment deleting reference to writs, section 12—1001 was clear in exempting property only from execution, attachment, and distress for rent. The statute lost that clarity when the legislature inserted the word "judgment" where "execution" formerly had appeared. No aspect of the amendment's history, however, supports a theory that the legislature intended this technical change

to extend the debtor's protection to the proceedings in the case at bar. Indeed, the Act's amended title negates this theory by declaring that the amended act is to exempt the specified property from "attachment and *sale for the enforcement of judgment* and from distress for rent." (Emphasis added.) 1979 Ill. Laws 1314, 1317.

Regarding the second amendment, which expanded exemptions in the wake of Federal bankruptcy reform, we find no evidence of legislative intent that would bear on the issue in this case. That legislators debated no aspect of the personal property exemption suggests, if anything, that they did not contemplate potential effects on maintenance liability.

In determining the validity of Eugene's contention that the exemption statute shields him from a contempt order, we need not confine our inquiry to the history of the disputed provision. We may also examine other legislation on the same topic, as well as statutes addressing related subjects. (*Bergin v. Board of Trustees* (1964), 31 Ill. 2d 566, 573-74.) Illinois, like the other 49 States, has long regarded contempt as an appropriate sanction for wilful failure to pay alimony or child support. (See *Mesirow v. Mesirow* (1931), 346 Ill. 219, 222; *Blake v. People* (1875), 80 Ill. 11, 14; *Buck v. Buck* (1871), 60 Ill. 105, 105-07; Note, *Domestic Relations—Enforcement of Maintenance and Support Orders by Contempt Proceedings—Imprisonment for Debt*, 42 Mo. L. Rev. 325, 327 (1977).) This procedure is authorized throughout the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1983, ch. 40, par. 101 *et seq.*), which refers often to contempt as a means of enforcing its provisions (*e.g.*, Ill. Rev. Stat. 1983, ch. 40, par. 502(e) (property-disposition agreements), par. 504(d) (maintenance), par. 505(b) (child support)). We believe it unlikely that the legislature, with neither express nor other evidence of intent, meant to limit this long-standing use of the contempt power when

it enacted the amendments to the exemption statute that are discussed above.

Finally, we note that where a statute is ambiguous, it is appropriate to examine not only its history and related legislation, but also the future consequences that would result from adopting one construction as opposed to another. (*Andrews v. Foxworthy* (1978), 71 Ill. 2d 13, 21.) Thus, we consider a recently enacted statutory scheme which provides our courts with a new tool for enforcing maintenance and support awards (Ill. Rev. Stat. 1983, ch. 40, par. 706.1). Under the new legislation, courts may order that the income of a nonpaying former spouse be withheld at the source and paid instead to the party to whom support is owed. (Ill. Rev. Stat. 1983, ch. 40, par. 706.1(F).) Significantly, this enactment applies to "any form of periodic payment to an individual, regardless of source, including, but not limited to: wages, salary, *** disability, annuity and retirement benefits, and any other payments, made by any person, private entity, federal or state government ***." (Ill. Rev. Stat. 1983, ch. 40, par. 706.1(A)(4).) This provision took effect on January 1, 1984, but courts may apply it to collect an arrearage that accumulated before the effective date. Ill. Rev. Stat. 1983, ch. 40, pars. 706.1(A)(1)(a), (A)(2).

The new scheme would subject to withholding orders Eugene Logston's income from his General Motors pension and from his disability benefits. It indeed would be anomalous to construe the personal property exemption statute as protecting Eugene from a contempt order, when his arrearage can now be collected from the very income on which he bases his exemption argument. The new statute also provides that any other State or local laws which limit or exempt income *shall not apply*. Ill. Rev. Stat. 1983, ch. 40, par. 706.1(A)(4)(e).

By applying accepted rules of statutory construction, the facial ambiguity of the exemption statute is resolved.

Contrary to the trial court's ruling, it is therefore not so vague and unclear as to render it invalid.

Also, based on the above considerations, we hold that section 12—1001 is not a defense to the order which held Eugene in contempt for nonpayment of maintenance. The fact that the trial court also entered judgment for the maintenance arrearage does not alter this result. Whether execution on that judgment may be had against exempt personal property is not at issue here. We conclude only that the contempt order may be enforced.

Eugene next contends that the trial court erred in two respects when it held him in wilful contempt of court for failure to pay maintenance. He asserts the exempt status of his income as one reason that the contempt order is improper. We have disposed of that claim above. We next address his second argument, that because he is unable to meet the maintenance obligations, his failure to pay is not wilful.

The power to enforce an order to pay money through contempt is limited to cases of wilful refusal to obey the court's order. (*Mesirow v. Mesirow* (1931), 346 Ill. 219, 222; *Taapken v. Taapken* (1976), 39 Ill. App. 3d 785, 788.) The noncompliance with an order to pay maintenance constitutes *prima facie* evidence of contempt. Therefore, once the *prima facie* showing is made, the burden shifts to the defendant, who may then defend by showing that he is unable to pay. (*Shaffner v. Shaffner* (1904), 212 Ill. 492, 496; *Storm v. Storm* (1973), 9 Ill. App. 3d 1071, 1075-77.) To prove this defense, a defendant must show that he neither has money now with which he can pay, nor has disposed wrongfully of money or assets with which he might have paid. *County of Cook v. Fry Roofing Co.* (1974), 59 Ill. 2d 131, 136; *Tudor v. Firebaugh* (1936), 364 Ill. 283, 288.

It is undisputed that Eugene Logston never has voluntarily paid maintenance. Such noncompliance, along

with the arrearage found by the court below, provides *prima facie* evidence of contempt. This court has described the burden of proof that a defendant must meet to rebut the *prima facie* showing:

> "He who seeks to establish the fact that his failure to pay is the result of lack of funds must show with reasonable certainty the amount of money he has received. He must then show that that money has been disbursed in paying obligations and expenses which, under the law, he should pay before he makes any payment on the decree for alimony. It is proper that he first pay his bare living expenses; but whenever he has any money in his possession that belongs to him and which is not absolutely needed by him for the purpose of obtaining the mere necessaries of life, it is his duty to make a payment on this decree." (*Shaffner v. Shaffner* (1904), 212 Ill. 492, 496.)

We are not satisfied that Eugene has met the requirements described above.

The record shows Eugene's monthly income with reasonable certainty. However, the evidence he presented is conflicting and incomplete with regard to his monthly disbursements. We cannot discern how much he actually pays each month for necessities such as rent and medical care. Nor can we tell whether he diverts some monthly income to payments for nonessential items, such as the recreational vehicle or the improvements to his wife's kitchen. We do know, however, that he spends $160 each month for recreation, gifts, hobbies, and the costs of volunteer work. We also know that during the period that the $4,043.10 arrearage here accumulated, Eugene spent a lump sum of cash in excess of $11,000 on a trip to California. We regard none of these expenditures as the "bare living expenses" that may be paid before the maintenance obligation is met.

This court has not stated the standard of appellate review for a contempt finding, but our appellate court often has stated that whether a party is guilty of con-

tempt is a question of fact for the trial court, and that a reviewing court will not disturb the finding unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion. (*E.g., People ex rel. Fahner v. Colorado City Lot Owners & Taxpayers Association* (1982), 108 Ill. App. 3d 266, 276; *In re Estate of St. George* (1981), 99 Ill. App. 3d 388, 390; *Comiskey v. Comiskey* (1977), 48 Ill. App. 3d 17, 25; *Taapken v. Taapken* (1976), 39 Ill. App. 3d 785, 787.) Adopting this standard, based on the evidence that Eugene presented, we conclude that the trial court neither abused its discretion nor reached a decision contrary to the manifest weight of the evidence when it rejected Eugene's defense of inability to pay and found him in wilful contempt of court.

The final question that Eugene raises is whether the trial court erred when it denied his request for termination of the $221.50 monthly maintenance payment. A court may modify a maintenance award "only upon a showing of a substantial change in circumstances." (Ill. Rev. Stat. 1983, ch. 40, par. 510(a).) The party seeking modification bears the burden of proving this change. (*In re Marriage of Chalkley* (1981), 99 Ill. App. 3d 478, 482; *In re Marriage of Potter* (1980), 88 Ill. App. 3d 606, 608; *Daum v. Daum* (1973), 11 Ill. App. 3d 245, 249.) Under the Illinois Marriage and Dissolution of Marriage Act, a trial court's decision as to modification will not be disturbed absent an abuse of discretion. (*In re Marriage of Kessler* (1982), 110 Ill. App. 3d 61, 73; *Shive v. Shive* (1978), 57 Ill. App. 3d 754, 759.) As this was the standard of review under the former divorce act (see *Scalfaro v. Scalfaro* (1970), 123 Ill. App. 2d 23, 29), and because the new statute reflects no intention to change the standard, we conclude that abuse of discretion is the proper standard of review. We conclude from the evidence discussed below that the trial court's denial of the

modification request reflects no abuse of discretion. Instead, we find that the evidence presented below is wholly inadequate to prove a substantial change in circumstances.

Since the dissolution of marriage, Eugene's monthly income has increased slightly, from $813.32 to $922.44. However, as noted earlier, the record is unclear with regard to the actual amount of his current regular monthly living expenses. Similarly, Eugene's testimony suggests that his medical and dental expenses recently have increased, but the written information that he filed indicates that these expenses have decreased since the divorce.

Eugene claims that Kate's present unemployment is unjustified and that this unemployment should bear on our decision of this issue. He also notes that her real estate has appreciated in value since the dissolution, and that the mortgage liability on that property has decreased. He stresses that Kate receives rental income, and that she has access to her mother's pension benefit.

Regarding these claims, we first observe that Kate undoubtedly reduces her monthly expenses greatly by personally caring for her mother instead of hiring attendants or placing her mother in an outside facility. At any rate, the record is silent as to whether this impediment to Kate's outside employment represents a change that has occurred since the divorce. Similarly, the evidence does not indicate whether the mother's pension became available for Kate's use before or after dissolution.

Concerning the real estate, its appreciation in value, the reduction of mortgage liability, and Kate's rental income do constitute changes that occurred after dissolution. However, the dissolution-of-marriage judgment expresses the parties' agreement that Kate would pay Eugene for his interest in the two houses. We find it rea-

sonable to infer, then, that the trial judge who determined the original maintenance award contemplated Kate's retention of the real estate. We do not consider it to be a substantial change in circumstances that Kate now receives the ordinary benefits of property ownership to which Eugene refers.

One final matter merits our attention. When a party is found in civil contempt of court, such as for failure to pay money, the contempt order is coercive in nature. The court seeks only to secure obedience to its prior order. Since the contempt order is coercive rather than punitive, the civil contemnor must be provided with the "keys to his cell." That is, he must be allowed to purge himself of contempt even after he has been imprisoned. (*People ex rel. Chicago Bar Association v. Barasch* (1961), 21 Ill. 2d 407, 409-10; *Continental Illinois National Bank v. Brach* (1979), 71 Ill. App. 3d 789, 792-93.) Accordingly, imprisonment for a definite period of time is improper in this situation. *Sullivan v. Sullivan* (1973), 16 Ill. App. 3d 549, 552.

The orders from which Eugene Logston appeals do not comport with these principles. The March 1983 order sentences him to not more than six months in jail, but allows him to purge himself of contempt and avoid this sentence by paying the arrearage within 30 days of the date of the order. The May 1983 order, issued on the denial of Eugene's motion for reconsideration, is silent as to the jail sentence but provides that Eugene may purge himself by paying the arrearage within 30 days of the date of the May order. Neither order provides for Eugene's release from jail if he should pay the arrearage *after* he is incarcerated. On remand, the contempt order should be revised to correct this problem.

We now reverse the circuit court's decision that section 12—1001 of the Code of Civil Procedure is unconstitutionally vague. The circuit court is affirmed with re-

spect to its finding of contempt and its denial of the petition for modification of the maintenance award. The cause is remanded to the circuit court of St. Clair County for further proceedings consistent with this opinion.

*Affirmed in part and reversed in part; cause remanded, with directions.*