2020 IL App (1st) 192107-U

FIFTH DIVISION
Order filed: June 5, 2020

No. 1-19-2107

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| PLATO FOUFAS, | ) | Cook County. |
| | ) | |
| Petitioner/Counter-Respondent-Appellant, | ) | |
| | ) | No. 91 D 4780 |
| and | ) | |
| | ) | |
| THEODORA ("TEDDY") FOUFAS, | ) | Honorable |
| | ) | Lori Rosen, |
| Respondent/Counter-Petitioner-Appellee. | ) | Judge, presiding. |

PRESIDING JUSTICE HOFFMAN delivered the judgment of the court.
Justices Rochford and Connors concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The circuit court's finding that husband was in indirect civil contempt for failing to pay maintenance to his ex-wife was not against the manifest weight of the evidence where the evidence showed husband had sufficient assets to pay the obligation but had voluntarily transferred them to a spendthrift trust with himself as the beneficiary. *Laches* did not bar the claim where husband did not show that he was prejudiced by his ex-wife's failure to petition for an adjudication of civil contempt earlier.

¶ 2    Plato Foufas (Plato) appeals from orders of the circuit court finding him in indirect civil contempt of court for refusing to pay maintenance to his former wife, Theodora Foufas (Teddy), and ordering him incarcerated until he purges the contempt by paying Teddy $5,183,621.78. For the reasons which follow, we affirm

¶ 3    The operative facts in this case are generally undisputed. The following statement of facts was gleaned from the common law record, the hearing on Teddy's petition for adjudication of contempt, and the exhibits presented during that hearing.

¶ 4    The parties were married in 1965. In a bifurcated proceeding, the marriage of the parties was dissolved on November 6, 1995, leaving the issues of property division and maintenance to be resolved at a later date. On May 23, 1996, while the property division portion of the dissolution proceeding was still pending, Plato, as settlor and grantor, caused the creation of the KM Settlement trust (KM trust) and transferred substantially all of his business holdings into the trust, including 98% of Plato Foufas and Company, Foufas Properties, Inc., Foufas Properties Forest Cove, Inc., and various interests in limited partnerships. Included in the trust document is a spendthrift provision. The original and present beneficiaries of the KM trust are Plato, his current wife Charmaine, and his son, Timothy. The current trustee is Orion Corporate and Trust Services, LTD, a corporation domiciled in Belize and which is a separate entity from any of Plato's companies. Guarantee Fiduciary Management LTD, a corporation domiciled in the Bahamas, is the protector of the trust. No portion of the principal of the KM trust has ever been distributed. The trust has been amended five times since 1996.

¶ 5    On October 4, 1999, a Supplemental Judgment was entered in the underlying dissolution proceeding, awarding Teddy monthly maintenance in the amount of $22,000. That Supplemental

Judgment also provided that the KM trust, referred to therein as the Grantor Trust, created by Plato "constituted a fraudulent conveyance in law in accordance with the provisions of the Uniform Fraudulent Transfer Act."

¶ 6    On November 12, 2003, Plato filed a petition seeking a modification of his maintenance obligation to Teddy. The circuit court denied the petition and, on December 14, 2004, denied Plato's motion for reconsideration. Subsequently, Teddy filed three petitions for rules to show cause against Plato, and the parties engaged in settlement negotiations until June 29, 2009, when the matters were taken off the call by the court.

¶ 7    In July 2009, Plato and Charmaine transferred and assigned all of their personal property to the KM trust.

¶ 8     On March 18, 2016, Teddy filed a petition seeking to have Plato found in indirect civil contempt of court for having failed to pay maintenance since January 1, 2006. Following a hearing on June 4, 2018, the circuit court found that Teddy had established a *prima facie* case of indirect civil contempt and issued a rule against Plato to show cause why he should not be held in contempt of court for failing to pay court ordered maintenance from January 1. 2006, through February 29, 2016.

¶ 9    Prior to the hearing on the rule to show cause, the parties jointly prepared agreed admissions, exhibits and stipulations. The hearing on the rule to show cause commenced on July 18, 2019. Plato was the only witness to testify. Plato had submitted a financial affidavit and an addendum that indicated he and Charmaine had monthly living expense totaling $32,626. He testified that all of his expenses were paid by the KM trust, including the mortgage, home equity loan, real estate taxes, utilities, home owners' association fees, and insurance premiums on his

home in Florida which he owns with Charmaine as tenants by the entirety. It was also established that the KM trust owns a house in Woody Creek, Colorado, which Plato uses from time to time and that the KM trust pays all of the expenses on the Colorado property, including the mortgage and utilities. Plato testified that Plato Foufas and Company, which is owned by the KM trust, rents an apartment at 1360 Lake Shore Drive in Chicago which he uses as an office and as a residence. He stated that he is the only one who uses the apartment.

¶ 10     Evidence established that the KM trust received approximately 8 million dollars in November 2016 from the sale of the Mansards Apartment Complex (Mansards) in Indiana. Plato's federal tax return for 2016, the year of the Mansards sale, shows an adjusted gross income of $16,398,419, $8,558,935 of which was from sources other than the sale of the Mansards. For the year 2016, Plato had a federal tax liability of $4,247,106.

¶ 11     Plato admitted that $342,000 was withdrawn from the KM trust on January 9, 2018 but testified he did not know what expenses were paid with those funds. On January 22, 2018, $55,552.07 was withdrawn from the KM trust; on February 22, 2018, $150,000 was withdrawn; and on March 28, 2018, an additional $175,000 was withdrawn. In total, $722,552.07 was distributed by the KM trust during the period from January 9, 2018 to March 28, 2018. When asked what the money was used for, Plato stated: "I don't know – I don't remember." Neither Charmaine nor Timothy has ever made a request for a distribution from the KM trust. In contrast, there is no record that a request for an income distribution by Plato has ever been denied. According to Plato, he is the only one who has ever made a request for payments from the KM trust.

¶ 12     The parties stipulated that Plato owes the Internal Revenue Service (IRS) $6,640,235.

¶ 13    On August 1, 2019, the circuit court issued its order, finding Plato in indirect civil contempt of court for willful failure to pay maintenance to Teddy, and ordering him committed to the Cook County Jail until he purges himself of contempt by paying $3,564,000 for past due maintenance plus statutory interest of $1,875,621.78, for a total amount due Teddy of $5,183,621.78. In support of its finding of contempt, the circuit court stated that: Plato failed to show an inability to pay the past due maintenance; the KM trust is the source of the funds paying all of Plato's expenses; Plato controls the KM trust; and, until at least June 27, 2019, Plato possessed the ability to amend the terms of the KM trust and/or make decisions regarding payments and distributions. The circuit court stayed its commitment order until November 1, 2019, to allow Plato time to post a $250,000 bond. No bond was ever posted.

¶ 14    On August 23, 2019, Plato filed a motion for rehearing, arguing that the circuit court failed to consider both the $6,640,235 he owed for federal taxes and the resulting tax lien filed by the IRS on all of his assets and the impact of that tax lien on his ability to comply with his obligation to pay the court ordered maintenance. On September 26, 2019, the circuit court denied Plato's motion for rehearing. The circuit court found Plato not to be a credible witness; stating, "I didn't believe most of what he has testified to." The circuit court concluded that Plato has the ability to pay the sums due Teddy. This appeal followed.

¶ 15    On November 15, 2019, this court entered an order staying enforcement of the incarceration portion of the circuit court's August 1, 2019 order pending final resolution of this appeal and the filing of this court's mandate in the circuit court.

¶ 16    In his brief before this court, Plato states that he does not dispute the validity of his maintenance obligation to Teddy or the fact that he has failed to make payments on that

obligation since January 1, 2006. Rather, in urging reversal of the circuit court's order finding him in indirect civil contempt and ordering his incarceration, Plato argues that he is incapable of complying with his obligation to pay maintenance. He asserts that he has no assets from which to pay the maintenance owed to Teddy and that the KM trust from which all of his expenses are paid has a spendthrift provision and specifically prohibits the use of trust assets to satisfy maintenance obligations. We find the argument unconvincing.

¶ 17    The circuit court has the power to enforce an order to pay money through a contempt proceeding where there has been a willful refusal to obey the court's order. *In re Marriage of Logston*, 103 Ill. 2d 266, 285 (1984) Non-compliance with an order to pay maintenance constitutes *prima facie* evidence of indirect civil contempt of court. *Id.* Once a *prima facie* showing is made, the burden shifts to the alleged contemnor to show that his noncompliance was not willful. *Id.* "A defense to contempt exists where the failure to obey an order to pay is due to poverty, insolvency, or other misfortune, unless that inability to pay is the result of a wrongful or illegal act." *In re Marriage of Petersen*, 319 Ill. App. 3d 325, 332–33 (2001) (citing *In re Marriage of Betts*, 155 Ill. App. 3d 85 (1987)). A defendant has the burden of proving that he neither has money to pay his obligation nor has he wrongfully disposed of money or assets with which he might have paid. *Peterson*, 319 Ill. App 3d at 333 (citing *Logston*, 103 Ill. 2d at 285). An alleged contemnor may not assert an inability to comply with a court order when he has voluntarily created the incapacity. *In Re Marriage of Kneitz,* 341 Ill. App. 3d 299, 304 (2003). Financial inability to comply with an order must be shown by definite and explicit evidence. *Petersen*, 319 Ill. App. 3d at 333 (citing *In re Marriage of Chenoweth*, 134 Ill. App. 3d 1015 (1985)).

¶ 18    The evidence in this case established that Plato both had the financial ability to pay his maintenance obligation to Teddy, and that he voluntarily transferred all of his assets into the KM trust to avoid his maintenance obligations. In May 1996, Plato, as settlor and grantor, caused the creation of the KM trust and transferred substantially all of his business holdings into the trust. In July 2009, Plato and Charmaine transferred and assigned all of their personal property to the KM trust. Plato and Charmaine have monthly living expense totaling $32,622 which are paid by the KM trust. In November 2016, the KM trust received approximately 8 million dollars from the sale of the Mansards. Plato's federal tax return for 2016 shows an adjusted gross income of $16,398,419, $8,558,935 of which was from sources other than the sale of the Mansards. $722,552.07 was distributed by the KM trust during the period from January 9, 2018 to March 28, 2018. When asked what the money was used for, Plato stated: "I don't know – I don't remember." Plato admitted, however, that he is the only one who has ever made a request for payments from the KM trust.

¶ 19    Plato insists that his only source of funds is the KM trust and that the terms of that trust prohibit the assets from being used to satisfy his maintenance obligations. He contends that the KM trust is irrevocable and that he lacks the ability to either control the trust or to amend its provisions. The fact remains, however, that Plato both voluntarily created the KM trust and voluntarily placed all of his assets into that trust with the obvious purpose of avoiding the payment of his maintenance obligations. The evidence clearly established that Plato had the ability to pay his maintenance obligations and willfully failed to do so. We conclude that Plato failed in his burden of proving that he neither had money to pay his maintenance obligations nor willfully disposed of money or assets with which he might have paid.

¶ 20     Next Plato argues that his IRS liens constitute a defense to payment of his maintenance obligation to Teddy. We disagree. Plato cites no authority for the proposition that an IRS lien is a defense to paying maintenance. The issue of whether the IRS can assert a lien against any monies Plato might pay towards his maintenance obligation to Teddy will not arise unless and until Plato pays Teddy the sums she is due and the IRS asserts a lien on those sums. At that time, the IRS and Teddy can resolve any dispute. Moreover, there is sufficient evidence in the record to conclude that, in light of his access to funds from the KM trust, Plato has sufficient funds to pay both Teddy and the IRS.

¶ 21     Finally, Plato argues that the doctrine of *laches* bars Teddy's claim for maintenance. We find no merit in the argument.

> " '*Laches* has been defined as "such neglect or omission to assert a right, taken in conjunction with a lapse of time of more or less duration and other circumstances causing prejudice to an adverse party, as will operate to bar relief in equity." [Citation.] The existence of *laches* "depends on whether, under all circumstances of a particular case, a plaintiff is chargeable with want of due diligence in failing to institute proceedings before he did." [Citation.]' " *In re Jamari R.*, 2017 IL App (1st) 160850, ¶ 60 (quoting *In re Adoption of Miller*, 106 Ill. App. 3d 1025, 1030 (1982)).

Absent prejudice to the respondent, a delay, even a lengthy one, in enforcing a maintenance obligation does not give rise to *laches*. See *In re Marriage of Coufal*, 156 Ill. App. 3d 814, 819 (1987). The respondent must demonstrate injury as a result of the delay, and, generally, having access to the funds during the time during which enforcement was delayed is actually considered a benefit to the respondent. *Id.* Here, Plato argues that he was prejudiced because he could have

moved to modify his support obligation sooner and obtained retroactive relief. However, he has identified nothing in Teddy's actions that misled him or prevented him from pursuing a petition to modify his maintenance obligation.

¶ 22    Whether a party is guilty of contempt is a question of fact to be resolved by the circuit court, and its resolution of the issue will not be disturbed on appeal unless it is against the manifest weight of the evidence or the record reflects an abuse. *In re Estate of Lee*, 2017 IL App (3d) 150651, ¶ 38, (citing *Logston*, 103 Ill. 2d at 286-87). For a finding of fact to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent. *In re Jay H.,* 395 Ill. App. 3d 1063, 1071 (2009). Based upon the record before us, we find that there is no clearly apparent opposite result from that reached by the circuit court on the question of whether Plato is guilty of indirect civil contempt.

¶ 23    The foregoing analysis leads us to conclude that the circuit court's order finding Plato in indirect civil contempt and ordering his incarceration until he purges the contempt by paying Teddy $5,183,621.78 is not against the manifest weight of the evidence. As a consequence, we affirm both the circuit court's order finding Plato in indirect civil contempt and its denial of his motion for rehearing.

¶ 24    Affirmed.