*In re* J.L.D., Alleged to be a Neglected Minor (The People of the State of Illinois, Petitioner-Appellee, v. Kristie L. Douglass, Respondent-Appellant).

Fourth District No. 4—88—0560

Opinion filed February 2, 1989.

Rex L. Reu, of Thomson & Weintraub, of Bloomington, for appellant.

Charles G. Reynard, State's Attorney, of Bloomington (Kenneth R. Boyle, Robert J. Biderman, and Michael K. Blazicek, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE SPITZ delivered the opinion of the court:

This is an appeal by respondent Kristie L. Douglass from an order of the circuit court of McLean County finding her in contempt of court and sentencing her to serve a term of imprisonment of 63 days in the McLean County jail. On February 25, 1987, following adjudication and dispositional hearings concerning the minor J.L.D., an order of protective supervision was entered on respondent, the minor's mother. The order had a duration of 12 months and required respondent to keep the minor enrolled in and attending school. The order further directed respondent to cooperate and ensure J.L.D.'s attendance and participation in such counseling at school as the Illinois Department of Children and Family Services (DCFS) deemed appropriate. The case was thereafter continued for a period of 12 months under the provisions of section 4—7 of the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 704—7).

On June 3, 1987, due to continuing problems with school absences, the McLean County State's Attorney's office filed a supplemental petition for adjudication of wardship. At the hearing on the supplemental petition, J.L.D. admitted its allegations, and the petition was granted. At the dispositional hearing, J.L.D. was adjudicated a ward of the court and his guardianship was transferred to DCFS. The order, among other things, authorized DCFS to take custody of the minor and directed DCFS to monitor his school attendance. Respondent was continued under an order of protective supervision that required her to cooperate with DCFS and further required her to have J.L.D. enrolled in and attending school. While guardianship was transferred to DCFS, J.L.D. was allowed to reside with respondent.

A supplemental report filed with the court by DCFS on January 20, 1988, noted that J.L.D.'s school attendance was "still sporadic." However, respondent was improving in her "parenting techniques." The report noted that she was still having some failures and had to rely on others' assistance, and recommended no change in the guardianship status.

A review hearing was conducted on March 16, 1988. At the conclusion of the hearing, the trial court directed DCFS to place J.L.D. in a foster home, but not in the home of a relative. The court also requested the State's Attorney to file a petition for rule to show cause against respondent. On March 21, 1988, a petition for rule to show

cause why respondent should not be held in contempt of court was filed. On March 30, 1988, the trial court entered an order directing respondent to appear and answer the petition.

In the meantime, J.L.D. had run away from foster care. At the hearing on the rule to show cause held on July 27, 1988, J.L.D. testified that on his second night in foster care, he took off running from the foster mother while they were at a drug store in Bloomington. He went to another store in the area and called his mother, and asked her to pick him up. According to J.L.D., when respondent arrived at the store to pick him up, she told him that she was going to take him back to the foster home. J.L.D. testified he told his mother that if she returned him to foster care he would run away again or try to kill himself. J.L.D. and respondent stayed in Bloomington together for a few days, and then went to Texas to stay with some cousins.

On cross-examination, J.L.D. testified he did not have any prearranged plan with respondent to pick him up from foster care and, in fact, respondent wanted to return him to foster care that evening, at least for one night until she could contact DCFS. He again acknowledged he told his mother that, if returned to foster care, he would run away again or he would kill himself. Over the course of the next few days, respondent drove J.L.D. by the DCFS office in Bloomington and talked with him about returning him to DCFS. However, J.L.D. repeatedly begged her not to, and threatened that he would do harm to himself, or run away again.

Respondent testified that J.L.D.'s school attendance in the fall of 1987 was improved. However, in December, he became ill with bronchial pneumonia and began having problems with other children in his class. In January 1988, J.L.D. began to "throw fits" when it was time to go to school and he would fight and grab the steering wheel of her car. Her caseworker at DCFS, Phil Foster, checked into the availability of foster homes, and, in fact, notified her in February 1988 to bring J.L.D. to the DCFS office on February 11, and to "bring his things." She took J.L.D. to the DCFS office as directed, but Foster told her to take him home.

After the hearing on March 16, when the court directed DCFS to place J.L.D. in foster care, respondent took his belongings to the DCFS office at the request of Mr. Mucci. Later that evening, on March 17, 1988, J.L.D. called respondent from a Bloomington grocery store, and asked her to pick him up. When she saw J.L.D. at the store, he was crying and shaking, and a nervous wreck. She first drove by the DCFS office, but there was no one there in the evening. She then drove by the foster family's home, at which time J.L.D.

threatened to kill himself or run away again.

Respondent testified she and J.L.D. stayed at a rest stop overnight, and then stayed with a friend. During this period of time, J.L.D. continued to threaten suicide. They left for Texas around March 20 and stayed with relatives. She called her mother from Texas and told her they would be returning the following weekend. On Friday, before they left on the return trip, Texas authorities took J.L.D. into custody and returned him to Illinois. Respondent then returned over the weekend and has since been working with DCFS as well as receiving counseling from a psychiatrist and a psychologist.

DCFS caseworker Maggie Wright testified the previous setting of the hearing on the rule to show cause had to be vacated because J.L.D. was threatening suicide and was not adjusted to his placement. She also testified she had requested a psychiatrist and a psychologist to prepare evaluations of both J.L.D. and respondent.

Those evaluations were admitted into evidence. The "Summary and Impressions" section of the psychosocial history stated respondent allowed J.L.D. "to assume the role of a parent in the family." According to the history, respondent "has a great deal of difficulty setting appropriate limits for [J.L.D.], as well as applying appropriate consequences." The psychological evaluation appended to the psychosocial history described respondent as "dependent" and "submissive" and lacking in self-confidence. A long period of therapy was indicated.

Following the testimony, respondent was held in contempt of court. She was sentenced to a term of 63 days imprisonment in the McLean County jail, and a mittimus was ordered.

A stay of the mittimus was denied, and the court, despite counsel's request, refused to specify whether the contempt was "criminal" or "civil" in nature. The court further refused to enter any purge order and respondent was taken directly from the courtroom to the jail. A written order was entered, which states in full:

"The court finds that the adult respondent Kristie Douglass is in indirect contempt of this court for removing the minor respondent from the State of Illinois when he was in placement to enforce school attendance in this State.

She is sentenced to a term of sixty three days imprisonment in the McLean County Jail for contempt."

The first issue to consider is whether this appeal should be dismissed as moot since respondent has served her sentence. A judgment of contempt which imposes a fine or sentence of imprisonment is appealable, enabling the reviewing court to consider the propriety of the order. (*People v. Shukovsky* (1987), 151 Ill. App. 3d 966, 503

N.E.2d 863.) However, an appeal from a contempt order is ordinarily considered moot where the party held in contempt has served the sentence. (*In re N.R.* (1988), 172 Ill. App. 3d 14, 525 N.E.2d 1193.) As this court pointed out in *In re N.R.*:

> "An exception to this rule has been created where the circumstances are likely to recur; there is a desirability for an authoritative determination for the future guidance of public officers; and the short duration of the action involved has rendered the matter nugatory before the issue can be reviewed by a higher court." (*In re N.R.*, 172 Ill. App. 3d at 15, 525 N.E.2d at 1194.)

In *In re N.R.*, this court found the question of good time for county jail sentences was an issue likely to recur frequently and that resolution of the issue would assist the court system in its administration.

■ Similarly, the case at bar presents for consideration improprieties which a determination here could prevent recurring in future cases. Therefore, this appeal will not be dismissed as moot.

Both parties concede this case involves indirect criminal contempt. The trial court refused to characterize the proceeding as criminal or civil contempt. This court analyzed the difference between criminal and civil contempt in *People v. Mowery* (1983), 116 Ill. App. 3d 695, 701-02, 452 N.E.2d 363, 368:

> "In general, criminal contempts are aimed at vindicating the authority and dignity of the court and the penalties are punitive; civil contempts are remedial, coercive and punitive. (*Gholson.*) One of the chief characteristics of civil contempt is that the contemnor must 'hold the key to the cell,' *i.e.*, he must have it within his power to purge himself by complying with the court's order.

> In 17 C.J.S. *Contempt* sec. 93, at 268-69 (1963), it is stated:

> 'If imprisonment is imposed for civil contempt it must ordinarily be coercive or remedial in nature rather than punitive. Imprisonment for civil contempt usually is not for a definite term, but the party in contempt stands committed unless and until he performs the affirmative act required by the order of the court. It is for this reason that in civil contempt it is stated that the contemnor carries the key of his prison in his pocket.'

> In *Eastman v. Dole* (1919), 213 Ill. App. 364, 370, the appellate court stated flatly, 'Any order prescribing a fine or imprisonment, or both, in a case of civil contempt should be made conditional upon compliance with the terms of the original or-

der.' See generally 12 Ill. L. & Prac. *Contempt* sec. 80 (1955)."

In *Mowery*, the majority of the court concluded the contempt was civil in nature because although the contemptuous act was the refusal to obey a court order following a criminal conviction, the disobedience was the wilful nonpayment of money.

 █ Regardless of the characterization placed on the contempt by the parties, the question becomes whether the order of the court is designed to get the contemnor to comply with a court order (civil) or whether the order is designed strictly to punish (criminal). In this case, respondent is being punished for taking the minor out of State. She was not given the opportunity to purge the contempt, nor could she have since the act had already been done and corrected. Therefore, this is a criminal contempt proceeding affording respondent the appropriate constitutional protections. *In re Marriage of Wilde* (1986), 141 Ill. App. 3d 464, 490 N.E.2d 95.

 █ In cases involving indirect criminal contempt, the contemnor is entitled to notice, to file an answer, to the assistance of counsel, to a reasonable opportunity to defend, to be proved guilty beyond a reasonable doubt, and to not be compelled to testify against herself. (See *People v. Marcisz* (1975), 32 Ill. App. 3d 467, 334 N.E.2d 737, *rev'd in part on other grounds sub nom. Marcisz v. Marcisz* (1976), 65 Ill. 2d 206, 357 N.E.2d 477.) The facts of the case at bar demonstrate that at no time was respondent ever notified the court was proceeding on the basis of an indirect criminal contempt. Unless a contemnor is notified *in advance* of the nature of the charge, the contemnor would be impermissibly precluded from asserting her due process rights and certainly could not knowingly waive such rights. Therefore, the failure of the trial court to advise respondent of the nature of the proceeding is reversible error.

The respondent also contends the order of the trial court finding respondent in contempt is fatally deficient. Respondent relies entirely on *People v. Mowery* (1983), 116 Ill. App. 3d 695, 452 N.E.2d 363. The *Mowery* majority decided, as noted earlier, that a civil contempt was involved. The allegation of contempt in the petition for rule to show cause was that Mowery failed to comply with a court order by failing to pay costs and restitution. In vacating the proceeding and sentence, this court pointed to three reasons. First, the State failed to prove defendant's nonpayment was wilful. The *Mowery* court's second reason was that the proof primarily concerned Mowery's failure to remain steadily employed, a violation of the court's order which was not alleged.

"Thirdly, and most significantly, the written order of commit-

ment which supplants the docket entry is in the form of an ordinary *mittimus*. It recites that the defendant was found guilty by 'verdict' and directs that he be incarcerated for 158 days for 'contempt.' Even under the most liberal construction this document is fatally deficient. (*Eastman*; Ill. L. & Prac. *Contempt*.) It does not show the jurisdiction of the court, it does not recite the facts upon which the contempt was based (*Wilcox*), it does not find that the conduct was wilful, and most importantly it does not provide any means whereby the defendant may purge himself." *Mowery*, 116 Ill. App. 3d at 704, 452 N.E.2d at 370.

The case at bar involving criminal contempt, the failure of the order to provide respondent a means to purge herself of the contempt would not be a reason for vacating the order. In the case at bar, there is both a written order and document entitled "County Jail Mittimus." Neither the written order nor the mittimus shows the jurisdiction of the court. Although the mittimus includes no finding of fact, the order finds respondent "in indirect contempt of this court for removing the minor respondent from the State of Illinois when he was in placement to enforce school attendance in this State." Neither the order nor the mittimus recites whether respondent was found guilty beyond a reasonable doubt.

The petition for rule to show cause alleged that the July 29, 1987, order of the court directed respondent "to cooperate in good faith with DCFS and notify DCFS by 12 noon on any day [J.L.D.] fails to attend school and the reason therefore [*sic*]." The petition further alleged respondent's wilful violation of the court order by:

"A. The minor failed to attend school on January 4, 5, 6, 11, 12, 13 and each school day thereafter until March 16, 1988 and [respondent] did not notify D.C.F.S. of his absence on any of those dates or the reason [J.L.D.] did not attend.

B. [Respondent] failed to deliver the minor to D.C.F.S. and cooperate with the placement of the minor."

The incident on which the court based the finding of contempt occurred after March 16, 1988, the day the court held a review hearing and directed J.L.D. to be placed in a foster home. Therefore, the proof would not have conformed to paragraph A. However, the proofs do arguably fit within the allegation of paragraph B.

■ And although the written order fails to recite the jurisdiction of the court, the court's jurisdiction can be found by resort to the record. The need for the order to be explicit as to jurisdiction is most evident in direct criminal contempt cases where no record has been made, but even then the reviewing court may look to the report of

proceedings to determine the propriety of the order. (*People v. Jashunsky* (1972), 51 Ill. 2d 220, 282 N.E.2d 1, *cert. denied* (1972), 409 U.S. 989, 34 L. Ed. 2d 256, 93 S. Ct. 332.) Here, the jurisdiction of the court can be found from resort to the record, even though the order does not recite it. In any event, it would seem a better practice for the trial court to recite jurisdictional facts to make certain the record on appeal is sufficient to uphold the order of the trial court.

■ However, the order does not find a "wilful" violation. Although the reviewing court can resort to the record to substantiate the finding of the trial court (*Hoga v. Clark* (1983), 113 Ill. App. 3d 1050, 448 N.E.2d 196), the finding itself here seems inadequate. In order to support indirect criminal contempt, the trial court must find the State proved beyond a reasonable doubt the failure to comply with the court's order was wilful. (*People v. Witherspoon* (1977), 52 Ill. App. 3d 151, 367 N.E.2d 313.) The facts would support a finding of wilful violation of the court order, but the trial court's order does not recite such a finding. As a result, the order of the trial court is deficient.

Accordingly, the order of the circuit court of McLean County is reversed.

Reversed.

McCULLOUGH, P.J., and GREEN, J., concur.