EILEEN PRYWELLER, Petitioner-Appellant, v. DALE PRYWELLER, Respondent-Appellee.

First District (2nd Division)   No. 1—89—2154

Opinion filed July 30, 1991.—Modified on denial of rehearing September 30, 1991, *nunc pro tunc* July 30, 1991.

Charles P. Fox, of Chicago, for appellant.

Pauker & Rubin, Ltd., of Chicago (Ira E. Rubin, of counsel), for appellee.

JUSTICE DiVITO delivered the opinion of the court:

Petitioner Eileen Pryweller appeals from the circuit court's order finding her in direct civil contempt for failure to produce her 14½-year-old daughter and 17-year-old son for therapy and visitation with their father, respondent Dale Pryweller, pursuant to an earlier court order. Petitioner was sentenced to imprisonment until such time as the two children, both inpatients in a psychiatric hospital, were released from the hospital and delivered to their father for therapy and two weeks of visitation.

On appeal, petitioner contends that the circuit court's finding of contempt is against the manifest weight of the evidence; that the order contains insufficient findings; and that the judge should have *sua sponte* recused herself from the proceedings due to her prejudice against petitioner.

The post-divorce litigation in this case has been complex. Respondent, an attorney, has filed numerous motions regarding visitation, therapy, and related issues. In January 1989, the circuit court noted that the computer printout of the case history indicated there were 217 court entries.

Petitioner and respondent were married in 1971, separated in 1977, and divorced in 1978 in California. Petitioner was given custody of the two children: Arielle, born October 3, 1974, and Nathan, born June 13, 1972. Petitioner later moved to Illinois with the children. Throughout the proceedings, respondent has remained in California, where he practices law. Respondent's visits with the children between

1977 and 1989 took place in South Bend, Indiana, at the home of his parents.

In 1981, the parties began litigating visitation issues in Illinois. On March 29, 1985, respondent filed his first contempt petition concerning visitation.

On December 28, 1987, the parties entered into an agreed order, which states, among other things, that the "parents agree to engage in regular therapy with a competent therapist of each person's choice. [Respondent] agrees to choose a therapist in California. *** The parties will agree upon a competent therapist for the children. Such therapist shall be a specialist at repair of parent-children relationships, and especially in adverse and hostile relationships between children and one parent. The purpose of therapy is the improvement of the children's relationship with their father. *** The children will see the same therapist, though not necessarily together." The order additionally states that "Both parents agree to participate in conjoint therapy sessions with the children, as requested by the children's therapist ***. The parties anticipate that in 1988 [respondent] will participate in conjoint therapy with the children, subject to the recommendations of the children's therapist, preceding or following each visitation." The order also provides that the parties agree that respondent shall have two weeks of visitation near the end of August each year.

On April 27, 1988, respondent filed a contempt petition regarding visitation and therapy; on May 31, 1988, he filed another contempt petition regarding visitation; on June 18, 1988, he filed a petition for a mental examination of petitioner; and on July 18, 1988, he filed a motion to modify the December 28, 1987, agreed order and revive certain withdrawn petitions.

On June 20, 1988, the court entered an order stating that Dr. August Crivolio, a psychologist agreed upon by the parties, would examine the children and petitioner in July 1988. One or both of the children ultimately saw Dr. Crivolio several times each month in February, March, April, May, and June 1989. After that time, the children refused to attend therapy.

On July 27, 1988, evidentiary hearings began on some of these petitions. These hearings were still in progress when the August 1989 contempt order was entered. Many of the petitions and motions remain pending in the circuit court.

On August 1, 1989, respondent filed an "Emergency Petition for Rule to Show Cause for Failure to Attend Previously Ordered Therapy and For Other Relief." On the same day, Dr. Crivolio wrote to the

court that petitioner had a meeting with him on July 28, and the children had one scheduled for August 9, 1989.

On August 2 and 3, 1989, the court heard testimony from both sides regarding the petition relating to the failure to bring the children to therapy.

On August 4, 1989, the court found that petitioner generally failed to "demonstrate her commitment to the agreed order of 12/28/87." Specifically, the court stated that petitioner "has not produced Arielle since 6/15/89 for weekly summer therapy visits with Dr. Crivolio and has not produced Nathan since 6/2/89 [sic] for weekly summer visits without cause or justification." Petitioner was therefore found in contempt of the December 28, 1987, order regarding therapy.

The court also referred to a June 25, 1989, order which directed petitioner to bring Arielle to therapy, and found that "there was no cause or justification on [petitioner's] part for failing to bring or deliver Arielle to therapy." Petitioner was also ordered to pay all costs for the August 2 and August 3, 1989, hearing.

The court stated that petitioner could purge herself of the contempt by taking the children for "intensive therapy as directed by Dr. Crivolio" and by complying with the agreed order of December 28, 1987, which provided for two weeks' visitation in August. The visitation was to run from August 10 to August 24, 1989. The court found "the above-mentioned terms are within the ability of [petitioner]." The court stated that if petitioner did not purge herself "of contempt in this fashion, she will be committed to the Cook County House of Corrections on August 25, 1989, and remain there until" respondent had two weeks' visitation, and the children "receive intensive therapy with Dr. Crivolio." The court concluded, "There will be a recall on this case at 9:00 a.m. on August 25, 1989, all parties to be present to determine whether or not the contempt order has been purged."

On August 10, 1989, petitioner filed an emergency petition for a stay of execution of the August 4, 1989, order, which was to go into effect August 25, 1989.

Petitioner testified on August 10, 1989, that, following the court proceeding on Friday, August 4, she informed the children of the substance of the court order. They were extremely upset about the continued forced therapy and visitation, and about the possibility of their mother being imprisoned. During the weekend, petitioner continued to encourage the children to comply with the order, but they reacted with increased rage and depression. They were very hostile and deeply confused.

Petitioner further testified that on Sunday, August 6, she telephoned Dr. Crivolio. She asked for his advice on how to get the children to see him. She testified:

> "I told him that I didn't think I would be able to do it without using force, and he said, 'Do not use force. Do not call the police. Do not threaten any harm to them.' He said he believed— it was his assessment, based on his limited knowledge of the therapy, that I had it within my power to persuade them to come, and that I was to use my powers of persuasion only."

Dr. Crivolio also told petitioner that he would be going out of town the following week and could not see the children after August 16.

Petitioner suggested to Dr. Crivolio that perhaps Dr. Jan Ostrand, a psychologist who had previously treated Arielle intermittently in 1986 through 1988, could meet with the children Monday, August 7, and Tuesday, August 8, to help prepare them to see Dr. Crivolio on August 9 with their father, and prepare them to begin the two-week visitation with their father on August 10. Dr. Crivolio did not object to this plan.

Petitioner told Dr. Crivolio "that this was not going to be easy, that this is my last, final effort. If I can't succeed here, I will be glad to go to jail. I will give up custody, whatever. I don't know what else to do."

Petitioner testified concerning some of the children's behavior that weekend. Arielle, crying, had thrown herself at her mother and threatened suicide if her mother was taken to jail. Nathan at one point was pounding on the kitchen counter "and I reached forward to calm him down, and I put my hand on his back, and he turned around and started pounding on me, several blows, and one to the center of the gut, which kind of knocked my wind out, and I was pretty stunned, and he backed off," apologizing.

Petitioner further testified that on Sunday, August 6, she also telephoned Dr. Ostrand, who told her that the children's "coping resources were extremely low, this is a dangerous situation." Dr. Ostrand gave petitioner the name of a psychiatrist; she felt a team evaluation in a hospital setting would be best.

On the same day, petitioner spoke with the staff at Good Samaritan Hospital in Downers Grove. Dr. Vinolus, a psychiatrist at Good Samaritan, conducted a telephone interview with petitioner regarding the behavior the children were exhibiting. Dr. Vinolus recommended that the children be taken to the hospital for further interviews.

Petitioner brought the children to the hospital on Sunday night, August 6. The children went willingly. After extensive interviews, the

staff recommended admission; however, because it was 11:30 p.m. by that time, petitioner wished to return home with the children and discuss the hospitalization with Dr. Vinolus when she could be reached in the morning.

On Monday morning, August 7, Dr. Vinolus, after speaking with the staff at the hospital, concurred with the staff's recommendation that the children be hospitalized. Dr. Vinolus believed the children should definitely be brought in right away, and said that two beds were now ready for them in the hospital.

When petitioner was asked to testify as to what preliminary diagnosis Dr. Vinolus gave, the court sustained a hearsay objection. The court stated, "If Dr. Vinolus was here to testify, that might be reasonable today, but she is not here." The court stated further, "This is essential. If there is a diagnosis, there should be a professional here to testify as to diagnosis and treatment. That is very, very important in this motion."

Petitioner testified further that Dr. Vinolus said the entire hospitalization might last as long as two or three weeks, "but that if her assessment on seeing them herself the next morning was such that they could be released to go to Dr. Crivolio, that she would do so."

Petitioner testified that Dr. Vinolus was told before admission of the children to the hospital that there was a court order, and that the children should be released to see Dr. Crivolio on Thursday. Dr. Vinolus responded, "Absolutely not. The children must" remain hospitalized. Petitioner stated that on the very day of her testimony, August 10, she had asked Dr. Vinolus to release the children for visitation that day. The court sustained a hearsay objection regarding the doctor's response.

Additionally, petitioner testified that on Monday, she informed respondent by telephone of the children's condition and hospitalization. On Tuesday morning, petitioner telephoned Dr. Crivolio and informed him of the hospitalization of the children and gave him Dr. Vinolus' name. Petitioner testified that Dr. Crivolio was reluctant to talk with Dr. Vinolus. Petitioner tried to tell Dr. Crivolio what the children had been doing but he insisted, "Don't tell me. I don't want to know." He was surprised, however, that "something would have happened that would have warranted hospitalization."

Following this testimony, petitioner's attorney asked the court to continue the proceeding for the purpose of having the hospital staff make a diagnosis or complete an evaluation. The attorney stated that they were waiting for the children to sign a release so that Dr. Vinolus could disclose information on their condition to the court. Dr.

Vinolus had stated she hoped they would sign a release within the next few days. The court responded that in other emergency motions, the "primary physician has always been in court to make known to the court what the condition of the children is. There is no primary physician or professional here in court today." The court declined to continue the proceeding, saying, "The children have been in there three days, three full days. There was an evaluation Sunday night, August 6th. This is presented as an emergency."

On August 10, after hearing her testimony, the court found petitioner in "direct civil contempt of the order of Friday [August 4]." The court based its finding on several facts: the children would not be visiting with their father for the two-week period in August; the children missed the August 9 therapy appointment with Dr. Crivolio; "both children testified [previously] that they didn't want any additional therapy and they also testified that they didn't want visitation"; and in April 1988 there was a visitation scheduled which did not occur, and the children called the Department of Children and Family Services (DCFS) and reported alleged misconduct by their father.

The court concluded there was "insufficient evidence presented today to stay the execution of judgment entered on Friday [August 4, 1989]." The court continued:

"[Petitioner] may purge herself of contempt by delivering the children to their father for two weeks' visitation as stated in the order, and the children will remain with their father for two weeks.

The Court finds that there was a therapy session with Dr. Crivolio August 9th. He was in place as the therapist to deal with the children. She testified that she called Dr. Ostrand to prepare the children for therapy and asked her to do it on the 7th and 8th. That didn't take place.

The only other manner in which she can purge herself of contempt is to obtain a report from Dr. Crivolio, and it is only Dr. Crivolio that this Court will rely upon for a finding that the children should be hospitalized."

Petitioner's counsel argued that the August 10 ruling was premature, since the court had previously ruled that petitioner had until August 25 to purge any contempt:

"PETITIONER'S COUNSEL: [The court is] taking advantage of our good faith in coming here. If we simply had not come, there was no requirement that the visitation start in court. The requirement is that the visitation start today, and it

was only to let the Court know, to inform the Court we are here, and you said you would wait until August 25th to determine if she had purged the contempt. You are now modifying that. There is no direct contempt by filing the motion.

THE COURT: The children are not here today. They are not here for visitation.

PETITIONER'S COUNSEL: They were not required to be.

THE COURT: They were not turned over for visitation, and I find her in contempt of the order now, so she is going to be taken to the Cook County House of Corrections. She may make a phone call beforehand."

On August 10, 1989, Dr. Crivolio wrote a letter to the court, stating:

"This is to inform you that I have no knowledge of the current psychological status of Nathan and Arielle Pryweller. I have not seen them since some time in June. Therefore I am in no position to evaluate whether or not they are in need of inpatient psychiatric hospitalization."

On August 11, 1989, petitioner wrote a letter to Good Samaritan Hospital, stating that she was in custody pursuant to court order, and could purge herself of contempt only by having the children released to their father. She wrote, "I hereby instruct you to deliver Nathan Pryweller and Arielle Pryweller to Dale Pryweller for two weeks of continuous visitation."

According to a petition for stay filed in this court on August 11, 1989, the circuit court found petitioner's August 11 letter insufficient to purge her of contempt, and the court refused to release her from jail. This court entered a stay on August 11, until August 15, 1989, and ordered respondent to file a response to the petition for stay. On August 14, 1989, respondent filed a response, in which he stated that as of August 11, the children had still refused to sign releases. In addition, the hospital apparently resisted releasing the children based only on the letter which petitioner wrote from jail. On August 15, 1989, this court vacated the August 11 stay.

The record contains numerous other disputed facts revealed in the two years of hearings held on respondent's various petitions. The only matter at issue here is the contempt finding. However, for a more complete picture, we summarize some of the background which led to the August 2 and 3, 1989, hearing and, ultimately, to the contempt finding.

The parties agree that there is a tremendous amount of hostility between the children and their father. There was testimony tending to

show both sides of relevant factual questions. Visits and therapy, particularly in the first six months of 1989, were viewed as highly unsuccessful by the children. They reported various incidents regarding the June 1989 visitation, some of which were minor, and some of which were admitted by respondent, though characterized differently. Arielle refused to go to any therapy or visit with her father after the June 1989 visit; Nathan went on one more visit, and then refused to continue with therapy or visits.

The record also shows that both children were extremely bright and did well in the various schools they attended, although there were occasional problems in school. In addition, Nathan apparently exhibited sleep disturbances, seizures, and growth problems throughout his teenage years.

■ Petitioner challenges the August 4 and August 10, 1989, contempt orders. Whether a party is guilty of contempt is a question of fact for the circuit court, and its decision will not be disturbed on appeal unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion. *In re Marriage of Logston* (1984), 103 Ill. 2d 266, 286-87, 469 N.E.2d 167; *Janov v. Janov* (1965), 60 Ill. App. 2d 11, 207 N.E.2d 691.

It was necessary here to show that petitioner's alleged contemptuous conduct was willful. See Ill. Rev. Stat. 1989, ch. 40, par. 607.1(a) (Illinois Marriage and Dissolution of Marriage Act provides that the court may use its contempt powers as a remedy for visitation abuse where "a party has *willfully* and without justification" denied another party visitation (emphasis added)); see also *In re Marriage of Logston*, 103 Ill. 2d at 285; *Wick v. Wick* (1960), 19 Ill. 2d 457, 167 N.E.2d 207; *Lauff v. Lauff* (1968), 99 Ill. App. 2d 139, 241 N.E.2d 205.

Respondent's reliance on *County of Cook v. Lloyd A. Fry Roofing Co.* (1974), 59 Ill. 2d 131, 137, 319 N.E.2d 472, for the proposition that intent is not relevant in a civil contempt proceeding is misplaced. That case does not involve the Illinois Marriage and Dissolution of Marriage Act, but rather a violation of a pollution-abatement order.

The court here stated that petitioner was in "direct civil contempt." Civil contempt is coercive in nature rather than punitive. (*In re Marriage of Logston*, 103 Ill. 2d 266, 469 N.E.2d 167.) The finding of contempt results from failure to do something which the court has ordered for the benefit or advantage of another party to the proceeding, and the court acts to compel the contemnor to obey the order for the benefit of that other party. (See, *e.g., Blankenship v. Blankenship* (1978), 63 Ill. App. 3d 803, 380 N.E.2d 1165 (contempt proceeding against father for failing to return 16-year-old child to mother after

visitation is civil in nature).) Criminal contempt is an act committed against the majesty of the law in disrespect of the court or its process, and the court acts to preserve its dignity by punishing the wrongdoer. See *Blankenship v. Blankenship*, 63 Ill. App. 3d 803, 380 N.E.2d 1165.

The parties on appeal dispute whether the alleged contempt was "indirect" or "direct" civil contempt. The distinction is significant because the procedures which must be followed vary according to the type of contempt involved. *In re Marriage of Betts* (1990), 200 Ill. App. 3d 26, 558 N.E.2d 404.

Direct contempt takes place in the presence of the court, and thus the elements of the offense are within the judge's personal knowledge, such as where a party makes outbursts during court proceedings, or refuses to comply with a court order by executing a deed in open court. (*In re Marriage of Betts*, 200 Ill. App. 3d 26, 558 N.E.2d 404.) In a direct contempt case, the court must act on facts which it personally knows, rather than on beliefs or conclusions the court reached after hearing the evidence. (*People ex rel. Kunce v. Hogan* (1977), 67 Ill. 2d 55, 364 N.E.2d 50.) The court may summarily punish a contemnor, and the direct contempt proceeding is summary in nature. *Kenwick v. Kenwick* (1963), 41 Ill. App. 2d 108, 190 N.E.2d 486; *Provenzale v. Provenzale* (1950), 339 Ill. App. 345, 90 N.E.2d 115.

In contrast, indirect contempt is not committed in the actual presence of the court. (*In re Estate of Shlensky* (1977), 49 Ill. App. 3d 885, 892, 364 N.E.2d 430.) The judge does not have full personal knowledge of the elements, and proof of facts of which the court cannot take judicial notice must be presented in order for the court to make a finding of contempt. *In re Marriage of Betts*, 200 Ill. App. 3d at 48, 558 N.E.2d at 416 (failure to comply with child support and maintenance orders is the "most common type of misconduct included in the indirect contempt category"), citing *In re Marriage of Logston*, 103 Ill. 2d 266, 469 N.E.2d 167.

■ In the case of an indirect contempt, the offender is entitled to the requirements of due process of law. (*In re Estate of St. George* (1981), 99 Ill. App. 3d 388, 390, 426 N.E.2d 6.) Due process mandates that certain procedural safeguards be afforded to a person charged with indirect contempt, including an evidentiary hearing with adequate notice of the time and place of such hearing. (*In re Estate of Shlensky*, 49 Ill. App. 3d at 892.) The basic components required to meet the due process requirements are notice and opportunity to be heard. (*In re Marriage of Betts*, 200 Ill. App. 3d 26, 558 N.E.2d 404.)

The contemnor cannot be punished summarily. *Kenwick v. Kenwick*, 41 Ill. App. 2d 108, 190 N.E.2d 486.

The proper designation of the contempt charge here is indirect civil contempt. Where a parent is found in contempt for failure to turn a child over to the other parent for visitation or custody, the conduct occurs outside of the court's presence and must be construed as *indirect* contempt. *In re Marriage of Ruchala* (1991), 208 Ill. App. 3d 971, 567 N.E.2d 725; *In re J.L.D.* (1989), 178 Ill. App. 3d 1025, 1030, 534 N.E.2d 190; *Sanders v. Shephard* (1989), 185 Ill. App. 3d 719, 541 N.E.2d 1150.

■ The circuit court's erroneous labelling of the nature of the contemptuous conduct is not in itself a basis for vacating the sanction imposed (*Sunset Travel, Inc. v. Lovecchio* (1983), 113 Ill. App. 3d 669, 447 N.E.2d 891), but, because the conduct at issue here could only have constituted indirect contempt, petitioner was entitled to the requirements of due process of law, including a full and fair hearing. (*In re Estate of St. George*, 99 Ill. App. 3d 388, 426 N.E.2d 6.) It was improper for the circuit court here to use summary contempt powers where the court relied on presumptions without allowing sufficient supporting evidence. Summary contempt power should be exercised with utmost caution and strictly restricted to facts known by the court, and not rest upon opinions, conclusions, presumptions, or inferences. (*People v. Loughran* (1954), 2 Ill. 2d 258, 118 N.E.2d 310; *People v. White* (1956), 8 Ill. App. 2d 428, 131 N.E.2d 803.) The court should take care to avoid arbitrary or oppressive conclusions. (*Bloom v. Illinois* (1968), 391 U.S. 194, 20 L. Ed. 2d 522, 88 S. Ct. 1477.) A contempt order may be reversed for denial of due process where the party is summarily punished without obtaining and considering extrinsic evidence necessary to determine whether the party is guilty of indirect contempt. *People v. Jashunsky* (1972), 51 Ill. 2d 220, 282 N.E.2d 1; *Panvino v. Panvino* (1978), 60 Ill. App. 3d 525, 377 N.E.2d 199.

■ Most significantly, indirect contempt may be proved only by extrinsic evidence, and thus the accused must be allowed to offer evidence in her own behalf. (*People v. Stafford* (1970), 118 Ill. App. 2d 453, 255 N.E.2d 17 (abstract of opinion); *Allendorf v. Daily* (1958), 17 Ill. App. 2d 493, 150 N.E.2d 665 (abstract of opinion).) Since the effect of contempt proceedings may deprive a person of liberty, every step provided by law should be substantially pursued. (*Robinson v. People* (1906), 129 Ill. App. 527, 531.) A court in an indirect civil contempt case cannot refuse to consider relevant evidence. (*Boettscher v. Howard Engraving Co.* (1945), 389 Ill. 75, 58 N.E.2d 866.) A con-

tempt hearing must afford the contemnor a full opportunity for explanation for noncompliance in order not to deprive the contemnor of procedural due process of law prior to depriving the person of her liberty. (*County of Cook v. Lloyd A. Fry Roofing Co.* (1974), 59 Ill. 2d 131, 139, 319 N.E.2d 472.) No one should be imprisoned unless the evidence "clearly shows that the party charged has [it] within his power" to comply with the court order. (*Lloyd A. Fry Roofing Co.*, 59 Ill. 2d at 136 (regarding power to pay money as required by court order).) In a hearing concerning visitation abuse, the court must hear "all the evidence" before it enters its order. Ill. Rev. Stat. 1989, ch. 40, par. 607.1(c).

In *Cole v. Cole* (1967), 85 Ill. App. 2d 105, 229 N.E.2d 293, the court held it was error for the trial court to refuse the defendant-father's attorney's request to cross-examine the plaintiff-mother, and to refuse defendant's request to present evidence in an attempt to purge defendant of the charge of contempt for failure to pay child support. "The defense to the contempt charge should, in our opinion, be thoroughly heard and considered." (*Cole v. Cole*, 85 Ill. App. 2d at 113.) The mere fact that a party has not complied with the divorce decree or court order is not a sufficient basis for holding that person in indirect contempt of court. *Cole v. Cole*, 85 Ill. App. 2d at 113.

In *Panvino v. Panvino*, this court reversed a trial court order finding the plaintiff mother in contempt of court for not permitting her 4½-year-old child to visit the defendant father pursuant to a divorce decree. The trial court heard the testimony of a psychiatrist who stated the child was moderately severely disturbed; had pronounced separation anxiety; and had a phobic reaction to the word "father." The plaintiff testified she had not sent the child to the defendant because the child became hysterical when the father appeared at the door. When the plaintiff's counsel asked to offer additional testimony as to the child's emotional problems, the trial court stated, "You've had plenty of hearing." The court then ordered the plaintiff to serve not more than six months in prison.

On appeal, the plaintiff in *Panvino* argued she was denied due process of law at the hearing on the alleged contempt. This court agreed, stating: "As is clear from the facts in this case the plaintiff was not afforded a fair and reasonable hearing by the trial judge. (*Eden v. Eden* (1976), 34 Ill. App. 3d 382[, 340 N.E.2d 141].) The trial judge was in error when he substituted his opinion in a medical situation for one of an expert whose qualifications the opposing attorney stipulated were excellent." (*Panvino v. Panvino*, 60 Ill. App. 3d at 526.) The court reversed the judgment as to the contempt sentence

and ordered the trial court to hold another hearing as to the visitation rights of the father. *Panvino v. Panvino*, 60 Ill. App. 3d at 526-27.

■ Similarly, in the present case, the circuit court erroneously refused to hear medical evidence regarding the condition of the hospitalized children before finding petitioner in contempt for not producing the children in court, and thereby denied petitioner a fair and reasonable hearing.

Dr. Vinolus informed petitioner that she could not divulge confidential information to the court without the children's written release, which she hoped to obtain shortly. Section 5 of the Illinois Mental Health and Developmental Disabilities Confidentiality Act provides that, where a patient or "recipient" of mental health care is between the ages of 12 and 18 years, both the parent and the recipient must consent to any disclosure of confidential records and communications. (Ill. Rev. Stat. 1989, ch. 91½, par. 805(a)(2).) Thus, both 14½-year-old Arielle and 17-year-old Nathan would have to sign a release pursuant to this statute. If only the parent consents, "there shall be no disclosure unless the therapist finds that such disclosure is in the best interests of such recipient." (Ill. Rev. Stat. 1989, ch. 91½, par. 805(a)(2).) Apparently, Dr. Vinolus did not find such disclosure would be in the best interests of Arielle and Nathan. Regardless, the court should have permitted petitioner an opportunity to present Dr. Vinolus for verification of her professional opinion.

In addition, the court must give the accused a reasonable opportunity to comply with a contempt order. (*Robinson v. People* (1906), 129 Ill. App. 527 (it is usually customary to give at least a few days' time in which to comply where failure to do so subjects a person to drastic process depriving him of liberty); *First National Bank & Trust Co. v. Desaro* (1963), 43 Ill. App. 2d 153, 193 N.E.2d 113.) Though it is discretionary with the court to allow a continuance in a contempt proceeding (*People v. Stollar* (1964), 31 Ill. 2d 154, 201 N.E.2d 97; *Jones v. Jones* (1963), 40 Ill. App. 2d 217, 189 N.E.2d 33; *Minnec v. Minnec* (1957), 14 Ill. App. 2d 214, 144 N.E.2d 174 (abstract of opinion)), the court abused its discretion in denying the request for a brief continuance here, particularly where the August 4, 1989, order gave petitioner until August 25, 1989, to purge the contempt. Petitioner chose to come to court on August 10, two weeks early, simply to inform the court of the ongoing deterioration of the children's emotional condition.

We conclude that the trial court abused its discretion in denying petitioner the opportunity to present evidence. Thus, under the princi-

ples discussed above, the trial court denied petitioner her due process rights in regard to the contempt order of August 10, 1989.

■ Moreover, in civil contempt proceedings, the contemnor must have the opportunity to purge the contempt, *i.e.*, be provided with the "keys to his cell," even after he has been imprisoned. (*In re Marriage of Logston*, 103 Ill. 2d 266, 469 N.E.2d 167.) The offender must also have the power to comply with the order. Contempt will not lie when the alleged contemnor, through no fault of his own, is in a position where he cannot comply with the order of the court. (*In re Estate of Shlensky*, 49 Ill. App. 3d 885, 364 N.E.2d 430.) The alleged contemnor must be given the opportunity to present evidence to show his inability to comply and the reasons therefor. *Shapiro v. Shapiro* (1969), 113 Ill. App. 2d 374, 252 N.E.2d 93.

The court's statement that petitioner could be released from jail if Dr. Crivolio provided an opinion that the hospitalization was necessary is puzzling. Dr. Crivolio adamantly refused throughout 1988 and 1989 to have any involvement with the litigation. In fact, Dr. Crivolio apparently informed petitioner that he did not want to speak to Good Samaritan Hospital about the children's condition; that he did not want to know the diagnosis made by Good Samaritan staff; and that he did not want to know the events leading up to the hospitalization. In addition, Dr. Crivolio was leaving on vacation in several days, and could do little to treat the children during the two-week visit which had been set up with the father, or assist the court in any way.

Dr. Crivolio also wrote to the court on August 10, 1989, that he was completely unable to provide the court with the information it requested as a means of petitioner's purging the contempt, because he had not seen the children in several months and knew nothing about their condition. The court therefore abused its discretion in including this alternative as a means for petitioner to purge the contempt. It was, in fact, no alternative at all.

■ We also emphasize that, even in contempt proceedings involving visitation abuse issues, the importance of the children's best interests must not be lost, and the children should not be used as pawns. (*In re Marriage of Fox* (1989), 191 Ill. App. 3d 514, 548 N.E.2d 71, citing *Simcox v. Simcox* (1989), 131 Ill. 2d 491, 546 N.E.2d 609.) Evidence of newly arisen facts previously unknown to the court should be considered on the question of the child's bests interests. (*Boggs v. Boggs* (1978), 65 Ill. App. 3d 965, 383 N.E.2d 9.) Here, the practical effect of jailing petitioner was to have the children released from the psychiatric hospital. The circuit court should have followed procedures which would have allowed it to ascertain whether or not that hospital-

ization was necessary for the safety of the children and for the safety of others.

Certainly in the tumultuous setting of this family, suicide threats by a nearly 15-year-old and a 17-year-old's punching his mother cannot be taken lightly. This is particularly true in light of the extensive testimony offered by respondent's expert that imprisonment of petitioner would severely increase the emotional problems from which the children already suffered. When Dr. Nahman Greenberg testified for respondent in July 1988, the court asked him how incarceration of the mother would relate to the best interests of the children. He responded:

> "Not well, in my opinion. I think it would be a demonstration to them about how things have to be with consequence. I would certainly think it would be worthwhile for the children to know that it is an option. The threat of incarceration, seems to me in this particular instance, as opposed to the actual incarceration, would be a message strong enough to hold. But actual incarceration, which would mean the loss of the children of their mother at this particular time when they have such a very ingrained, close, intimate excessively so relationship, I think it would cause anguish, cause severe crisis, especially in Arielle."

In late August 1988 (one year before jailing petitioner), the court referred back to that testimony:

> "[Dr. Greenberg opined that] placing the mother in jail would be detrimental to the children, he said it would be very detrimental. \*\*\* [T]hey are so dependent and interdependent with her, that removal or jailing of [petitioner] would be seriously detrimental to the children. So the court discarded that notion at that time. \*\*\* [T]he court does not believe, given the facts that these children have actually run away when visitation has been set up on particular days, the court does not believe it can order these children to see their father when they don't want to see their father. \*\*\* [T]he court is of the opinion that nothing would come by ordering visitation which will not be complied with again, which has not been complied with for almost six months, with 13 and 16 years olds who are behaving as they are."

Against this background, it can hardly be said that it was in the children's best interests for the court to incarcerate their mother while they were hospitalized; to refuse to determine the medical diagnosis which placed them in the hospital; and to refuse to discover why the

treating psychiatrist had strongly recommended against their release for visitation.

Though we reverse the circuit court's contempt finding because of due process violations, the history of this case reveals the possibility of petitioner's substantial contumacious disregard of the circuit court's order. In reaching its conclusion without an adequate hearing, the circuit court deprived petitioner and itself of an orderly and objective development of the events leading to the order of contempt. Because of the inadequacy of the hearing on August 10, 1989, and because of the seriousness of the charged conduct, we remand the cause for a proper hearing to allow the development of evidence both in support of and in opposition to an appropriate sanction.

■ Finally, petitioner contends that the circuit court was biased against her because of certain prejudgment statements made by the court. Our review of those statements and the record discloses no merit to that allegation.

Accordingly, the judgment of the circuit court is reversed and the cause is remanded to the circuit court for a hearing consistent with this opinion.

Reversed and remanded, with directions.

HARTMAN, J., concurs.

JUSTICE COCCIA, concurring in part and dissenting in part:

I concur with the holdings and analysis of the majority on all issues except its decision to remand for a new hearing. I would reverse the finding of contempt without ordering another hearing to be conducted.

In deciding whether a new contempt hearing is necessary, the court should look to the purpose and character of the sanction imposed by asking " 'what does the court primarily seek to accomplish by imposing sentence?' " (*People v. Doherty* (1988), 165 Ill. App. 3d 630, 634, 518 N.E.2d 1303, quoting *Shillitani v. United States* (1966), 384 U.S. 364, 370, 16 L. Ed. 2d 622, 627, 86 S. Ct. 1531, 1535.) A sanction for civil contempt is prospective in nature and primarily intended to compel a contumacious party to comply with the court's order for the benefit of another party. (*People v. Doherty*, 165 Ill. App. 3d 630, 518 N.E.2d 1303.) Thus, civil contempt is coercive in nature rather than punitive. *In re Marriage of Logston*, 103 Ill. 2d 266, 469 N.E.2d 167; *Blankenship v. Blankenship* (1978), 63 Ill. App. 3d 803,

380 N.E.2d 1165 (contempt proceeding against father for failing to return 16-year-old child to mother after visitation is civil in nature).

Here, the contempt hearing was held two years ago. At that time, the court wished to compel petitioner to produce the children for therapy and visitation with respondent. Nathan is now 19 years old and can no longer legally be forced to see his father. Arielle is nearly 17 years old. Notably, at oral arguments this court was informed that Arielle went on one additional visit with her father. During that visit, she ran away from South Bend and returned to Chicago. In practical terms, it is doubtful that Arielle can be forced to see her father.

In my opinion, at this late date the court's attempts to compel petitioner to force the children to see their father has become moot. Holding another contempt hearing at this point in time would be meaningless. It does nothing more than impose further burdens on the already strained financial and emotional resources of the parties and their children, and on the resources of the trial court and any court hearing the case in subsequent appeals.

Moreover, the purpose of the hearing would be to permit petitioner to introduce medical evidence by psychiatrists regarding the children's condition in August 1989. As the majority stated, the accused must be allowed to offer evidence *in her own behalf*. (*People v. Stafford* (1970), 118 Ill. App. 2d 453, 255 N.E.2d 17; *Allendorf v. Daily* (1958), 17 Ill. App. 2d 493, 150 N.E.2d 665.) If, however, petitioner has already shown through the evidence she presented that no willful contempt occurred, the additional hearing has little meaning.

Predicated on the following, I would find that the record does not reveal willful disobedience by petitioner of the court order requiring the children to go to therapy with Dr. Crivolio.

Notably, the trial judge failed to include in the order a finding of "willful" violation. See *In re J.L.D.* (1989), 178 Ill. App. 3d 1025, 1033, 534 N.E.2d 190 (indirect criminal contempt order reversed where order fails to find willful violation and record did not substantiate finding of willful violation); *Janov v. Janov*, 60 Ill. App. 2d 11, 15, 207 N.E.2d 691 (contempt order must in fact find that failure to comply with divorce decree was willful).

Furthermore, in support of my finding that any contempt here was not willful, I point to the erroneous bases of the trial court's decision. For example, when it found petitioner in contempt, the court relied on certain alleged visitation abuse relating back to April 1988. This was error, where evidence regarding visitation abuse related to petitions other than the therapy-related petition which was at issue in the contempt charge. Moreover, as to the petitions relating to visita-

tion abuse, petitioner had not yet had the opportunity to present any evidence in her defense. The only hearing which was completed at the time of the contempt charge was the hearing regarding the therapy-related petition.

The court also found a basis for contempt in that the children were supposed to be in "intensive therapy." However, the children were inpatients in a psychiatric hospital setting, the most intensive therapeutic setting possible. Although this was not with Dr. Crivolio's participation, the therapy was much more likely to be beneficial to the children where they voluntarily chose to be committed to the psychiatric hospital. (Interestingly, petitioner had invited respondent to participate in the hospital setting, but respondent refused.)

Finally, the court found petitioner in contempt based on the children's prior testimony that they wanted to "get out of" visitation. This is not a sufficient basis to find petitioner in willful contempt.

Thus, the bases of the court's finding of contempt reveal that the manifest weight of the evidence does not support a finding of willful contempt. In view of this evidence, I see no reason to remand the cause for a rehearing on the contempt petition in question in order to permit petitioner to supply even more evidence in her behalf.

For these reasons, I would reverse the finding of contempt and I would not remand for a new hearing.