# Illinois Official Reports

## Appellate Court

***Milton v. Therra*, 2018 IL App (1st) 171392**

| | |
|---|---|
| Appellate Court Caption | LEZETTE MILTON and ANTWONNE STRONG, Plaintiffs-Counterdefendants-Appellants, v. BOUREMA THERRA, FATOUMATA TRAORE, and UNKNOWN OCCUPANTS, Defendants-Appellees (Bourema Therra, Counterplaintiff). |
| District & No. | First District, Second Division<br>Docket No. 1-17-1392 |
| Filed | June 14, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-M-1709788; the Hon. David A. Skryd, Judge, presiding. |
| Judgment | Affirmed in part, vacated in part, and remanded with instructions. |
| Counsel on Appeal | Arthur J. Data III, of Chicago, for appellants.<br><br>Arthur E. Rosenson, of Cohen Rosenson & Zuckerman LLC, of Chicago, for appellees. |
| Panel | PRESIDING JUSTICE MASON delivered the judgment of the court, with opinion.<br>Justices Neville and Pucinski concurred in the judgment and opinion. |

**OPINION**

¶ 1    In these forcible entry and detainer proceedings, the trial court entered judgment in favor of the tenants, Bourama Thera[1] and Fatoumata Traore, finding that the landlord, Lezette Milton,[2] wrongfully denied the tenants possession of the leased premises. The trial court also entered judgment in favor of Thera on his counterclaim for lost profits sustained as a result of the interruption of his business conducted on the premises, as well as repair costs, attorney fees, and court costs in the total amount of $29,615.95. During the course of the proceedings, the trial court found Milton in contempt for failing to comply with certain orders and awarded Thera relief in the form of attorney fees incurred in pursuing two petitions for a rule to show cause, as well as compensation for personal property allegedly stolen by Milton.

¶ 2    In this appeal, Milton challenges (i) the judgment entered in Thera's favor for lost profits, contending that the claim was beyond the court's authority in a forcible action, and (ii) two of the contempt orders, contending that the court failed to follow the procedures required to make such findings. We agree with Milton and vacate the money judgment in Thera's favor as well as two of the contempt findings and remand for further proceedings.

¶ 3    Milton filed her verified complaint on June 8, 2016, naming only Thera as a defendant. She alleged that she (and Antwonne Strong) owned the leased premises located at 12255 S. Halsted Street in Chicago, having purchased the property following a lender's foreclosure. Milton claimed that as of May 31, 2016, Thera owed $5109 in unpaid rent under a commercial lease for the property entered into between Thera and Letitia Jenkins, the previous owner of the property. A copy of the lease was attached to the complaint. The lease between Jenkins (whose first name was incorrectly spelled "Leticia" in the lease) and Thera had a 10-year term commencing February 2, 2012, and provided for monthly rent in the amount of $425. Milton also attached a ledger purportedly showing the history of rent payments, which reflected monthly payments of $425. Finally, Milton attached a 10-day notice reflecting service on Thera on May 3, 2016.

¶ 4    On the same day the complaint was filed, Milton changed the locks on the premises, proceeded to commence major construction work, and removed and discarded certain personal property used in Thera's business, a salon called Tata Hair Braiding, which Thera operated with his wife.

¶ 5    Milton's self-help was the subject of substantial motion practice in the forcible entry case. The trial court initially ordered Milton to provide Thera with keys to the new locks by July 22, 2016. During a status hearing on July 28, 2016, the court ordered Milton to complete the rehab work on the premises by August 11, 2016, and to provide Thera access to the premises. Additionally, during this hearing, Milton sought and was granted leave to amend her complaint to add a party and a count based on Milton's claimed discovery of a different lease for the premises. Despite the court's July 28 order, Milton again changed the locks on July 29.

¶ 6    Milton did not immediately file her amended complaint, and after she changed the locks for the second time, Thera filed a counterclaim seeking lost business profits as a result of being

_____

[1]Although the case caption lists defendant's name as "Bourema Therra," defendant spells it as "Bourama Thera."

[2]Although Antwonne Strong is named as a plaintiff and is alleged to be an owner of the property, he had no apparent involvement in the proceedings, and so we refer only to Milton.

locked out of the premises. On September 13, 2016, Thera also filed a petition for a rule to show cause against Milton for having failed to comply with the July 28 order regarding completion of the work and providing Thera access to the premises.

¶ 7    Milton responded to the petition, alleging that she lacked control over completion of the work, since she had no expertise in construction and had hired a contractor to perform the repairs. Milton also filed a motion to dismiss Thera's counterclaim, arguing that Thera's claim for lost profits was not within the scope of the forcible entry proceedings. Milton later filed her amended verified complaint on October 14, 2016.

¶ 8    In her amended complaint, which added Traore as a defendant, Milton claimed that the lease attached to her original complaint was not, in fact, a valid lease for the property and that both she and the lender had been unaware of the existence of any other lease at the time Milton purchased the property. Milton alleged that the lease attached to the original complaint had been forged by Thera in an attempt to make a "legitimate claim to possession of the property." Milton claimed the real lease for the property—attached as an exhibit to the amended complaint—was entered into between Jenkins (whose first name is correctly spelled "Letitia") and Traore, doing business as Tata Hair Braiding. According to Milton, Traore "allowed [Thera] to use the property." The newly discovered lease was for a three-year period from April 1, 2011, to April 1, 2014, and provided for rent in the amount of $900 per month. The tenant's signature on the lease is illegible, but there are initials next to Traore's name on the same page. "Oumou Thera" is also listed as a tenant, but there are no initials next to that name, and Thera did not sign the lease. Unlike the original complaint, the amended complaint did not attach the ledger of rental payments showing rental payments of $425 per month during 2015 and 2016, when the supposed "real" lease would not have been in effect. In addition to the count seeking possession of the property, Milton included a claim for fraud based on Thera's alleged conduct in forging the 10-year lease. She sought $1425 in damages, representing unpaid rent under the newly discovered lease.

¶ 9    The trial court held a hearing on Thera's petition for a rule to show cause on October 21, 2016. The order entered on that date recites, "Defendant's motion is granted and a Rule to Show Cause is entered against Plaintiffs; Plaintiffs are ordered (again) to complete all work in the leased premises by 11/30/16." The order further reserved consideration of Milton's "right to recover attorney's fees & costs & related relief." No transcript of the October 21, 2016, hearing is contained in the record, and the order contains no factual findings. Thera later filed a petition for attorney fees.

¶ 10    The work on the premises was not completed by November 30. After a status hearing held on December 14, the court ordered that the tenants could resume occupancy of the premises the following day based on Milton's representation that the work had been completed.

¶ 11    Thera filed a second petition for a rule to show cause on January 24, 2017, alleging that Milton had failed to comply with the October 21, 2016, order because work on the premises had not been completed, evidenced by the fact that the premises lacked heat and running water. The court granted Milton an opportunity to respond and also granted Thera leave to file a fee petition relative to the first petition for a rule to show cause.

¶ 12    In her response, Milton asserted that, insofar as heat and running water were concerned, she was unable to comply with the court's order because neither of those utilities was in her name. She pointed out that both the original and the newly discovered lease provide that the tenant is responsible for utilities. Milton further asserted that work on the premises was

complete "to the extent that Defendants can move back into the property and continue their business."

¶ 13    All matters, including Milton's motion to dismiss the counterclaim and Thera's pending petition for rule, were later scheduled for trial on March 16, 2017. No transcript of the trial is included in the record, and the parties have instead provided us with an agreed statement of facts pursuant to Illinois Supreme Court Rule 323(d) (eff. Dec. 13, 2005). As it pertains to the evidence at trial, the parties stipulated:

"Milton testified she purchased the Premises from a bank knowing that defendant was then leasing the Premises pursuant to a lease that had been given to Milton by the Bank ('Lease A') and that this lease provided for defendant to pay $425.00 in rent per month for the Premises. Lease A was entered into evidence. (PX1) After filing this lawsuit, Milton testified she spoke with Jenkins who provided her with another lease for the Premises, which lease was not signed by Defendant ('Lease B'). Lease B was also admitted into evidence. (PX2) Lease B provided for rent in the amount of $900.00 per month for the Premises. Jenkins testified she owned the Premises before it was foreclosed by the bank and sold to Plaintiff. She testified that Lease A was never signed by her and that her first name was spelled incorrectly and that Lease B was the last lease she signed for the Premises before the Premises was foreclosed on. Letitia provided two checks corresponding to rent under the lease that she provided, both of which were from 2011 and pre-dated the commencement of the term of Lease A.

On cross-examination, Milton admitted that, in March 2016, she acquired the Premises knowing that Defendant was leasing the Premises to operate his business under Lease A. Milton admitted that, in March 2016, she met with Defendant and told him that she now owned the Premises. She then accepted from Defendant on March 4 a rent payment for March 2016 in the amount of $425 under Lease A and provided defendant with a receipt. Milton admitted that, in April and May 2017, she refused *** to provide Defendant with a receipt for the $425 monthly rent payments Defendant offered. Milton admitted that her Landlord's Ten Day Notice contained incorrect statements. (DX3) For instance, the Notice was purportedly signed by Milton on May 3, 2016, but was notarized by Linda Nickel on June 3, 2010. The Notice sought payment of $5,109 in rent but Milton had just acquired title to the Premises in March 2017 and had accepted the March rent payment from Defendant. As a result, $5,109 of rent was not due Milton as of June 2017. After filing the forcible action on June 8, 2017, Milton admitted that she subsequently accepted Defendant's April and May 2016 rent payments ($425 each, totaling $850) that were tendered through her counsel on June 27, 2016. (DX2) Milton admitted also that, on June 8, 2017, she locked Defendant out of the Premises without advance notice so that he could not operate his business, removed all of his belongings from the Premises, and demolished much of the interior.

On cross-examination, Jenkins admitted that before the premises was foreclosed on by the bank, Defendant had been her tenant, had been paying her rent, and that she had provided Defendant with monthly receipts for his $425 rent payments.

Defendant testified that, from August 2000 to the present, he and his wife operated 'Tata Hair Braiding' at 12255 S. Halsted in Chicago under a series of written leases. Most recently, in January 2012, defendant, as tenant, and Jenkins, as landlord, entered

- 4 -

into Lease A for the Premises[.] The Lease A term commenced February 2, 2012, and ends February 2, 2022. The rent is $425 per month. Defendant provided proof of the receipts provided to him by Jenkins for the dozen or so monthly $425 payments that he had timely made to Jenkins under Lease A in 2014, before the foreclosure proceedings began and a receiver was appointed. (DX4) Defendant testified that, before Milton purchased the Premises, he recorded Lease A on April 30, 2015, with the Cook County Recorder of Deeds as Document No. 1512013025. In March 2016, Defendant testified that Milton stopped by and informed defendant she now owned the Premises, having purchased it from a bank due to the Premises being in foreclosure. As a result, Defendant testified he paid Milton rent for March 2016 in the amount due under Lease A ($425) and that Milton accepted the payment and tendered to him a receipt. (DX1) Defendant denied being a party to Lease B or ever paying rent under Lease B. In April and May, Defendant testified that Milton refused to provide him with receipts for the $425 rent payments he was offering to make. After the filing of the forcible action, defendant tendered to Plaintiffs' counsel on June 27, 2016, his April and May 2016 rent payments that had been due under Lease A ($425 each, for a total of $850) and that Plaintiff accepted these payments. Defendant testified that, on June 8, Plaintiffs locked him out of and removed his belongings from the Premises. As a result, he and his wife were put out of business until April 2017. By paying all rent due under the Lease to Milton for March-May 2016 (and otherwise being excused from paying rent thereafter under various Court Orders), Defendant testified that he had fully performed his obligations arising under the Lease but that Plaintiffs had materially breached the Lease by denying him access to the Premises."

¶ 14      With respect to both claims in Milton's complaint, the court ruled in favor of Thera and against Milton. (Traore never filed an appearance and is not mentioned in the judgment order.) The court further ruled in favor of Thera and against Milton on his counterclaim for lost profits, although no evidence of Thera's lost profits was presented at trial. With respect to the pending rule to show cause, the court awarded Thera the sum of $2953, representing the amount he expended to render the premises habitable, as well as court costs and attorney fees.[3] The court directed Thera to file supplemental supporting documents to establish his lost profits and attorney fees. No separate order on Thera's pending petition for a rule to show cause was ever entered.

¶ 15      On April 20, 2017, the court entered final judgment awarding Thera a total of $26,615.95 for lost profits, repair costs, attorney fees, and court costs. The court further permitted Thera to offset rent due under the lease against the judgment, effectively relieving him of his obligation to pay rent for the remainder of the lease term. The order states that it is final and there is no just reason to delay enforcement or appeal. The court did not enter a separate order addressing Milton's motion to dismiss the counterclaim.

¶ 16      Evidently the court's judgment did not deter Milton in her efforts to oust Thera from the property. In an emergency motion for a temporary restraining order filed on May 8, 2017, Thera alleged that on May 2 Milton broke into the premises, deactivated the alarm, and removed certain property belonging to Thera. Milton also demanded rent for March and April,

_____

[3]The record is unclear as to whether the repair work on the premises was complete as of the court's March 16, 2017, order. Thera resumed operation of his business sometime in April 2017.

in violation of the court's April 20 order permitting Thera to offset rent against the judgment. At the May 8 hearing on Thera's motion, Milton was ordered to vacate the premises and allow Thera to offset rent, both of which she thereafter refused to do, leading to yet another petition for a rule to show cause filed on May 15, 2017.

¶ 17 On May 18, 2017, the trial court entered an order stating: "The motion is granted and a rule to show cause is entered against Lezette Milton as to why she should not be held in civil contempt for violating the Court's May 8, 2017 (and April 20, 2017) orders." The court set a hearing on the rule to show cause for May 23. It also granted Thera leave to recover his attorney fees and the value of the personal property taken from the premises, unless such property was returned by May 22.

¶ 18 Thera submitted a supplemental fee petition seeking $3237 in attorney fees and $4255 in compensation for his stolen property, which included a television, a computer, couches, cabinets, and security cameras. On May 23, 2017, "the submissions and evidence having been considered by the Court," the trial court entered a supplemental judgment granting Thera the full amount he requested. The court noted that it was entering judgment over Milton's objection that she had not been served with a rule to show cause and was not afforded a hearing in accordance with due process.

¶ 19                                                 ANALYSIS

¶ 20 On appeal, Milton argues that (i) the trial court could not consider Thera's counterclaim for lost profits in a forcible entry and detainer action and (ii) the trial court deprived her of due process by finding her in contempt of court without giving her proper notice and a hearing. We consider these contentions in turn.

¶ 21                              Thera's Counterclaim for Lost Profits

¶ 22 Milton argues that the trial court could not rule on Thera's counterclaim for lost profits, since Milton's cause of action was brought as a forcible entry and detainer action, in which the court is limited to deciding the issue of possession. Thera argues that, under the facts of this case, his lost profits are sufficiently tied to the issue of possession such that the trial court could properly consider them. We agree with Milton.

¶ 23 A forcible entry and detainer proceeding is unique in that it is a summary statutory proceeding for determining possession rights without the added complication of deciding unrelated matters. *100 Roberts Road Business Condominium Ass'n v. Khalaf*, 2013 IL App (1st) 120461, ¶ 31; *Newport Condominium Ass'n v. Talman Home Federal Savings & Loan Ass'n of Chicago*, 188 Ill. App. 3d 1054, 1058 (1988) (when entertaining forcible entry and detainer actions, the court "has limited and special jurisdiction without equitable powers"); *Bismarck Hotel Co. v. Sutherland*, 92 Ill. App. 3d 167, 174 (1980). Thus, the forcible entry and detainer statute provides that "no matters not germane to the distinctive purpose of the proceeding shall be introduced by joinder, counterclaim or otherwise. However, a claim for rent may be joined in the complaint, and judgment may be entered for the amount of rent found due." 735 ILCS 5/9-106 (West 2016). Our supreme court has defined "germane" to mean closely allied, related, or connected. *Rosewood Corp. v. Fisher*, 46 Ill. 2d 249, 256 (1970). Therefore, the only factual questions that need to be answered in this type of proceeding are "which party is entitled to immediate possession and whether a defense which is germane to the distinctive purpose of the action defeats plaintiff's asserted right to possession." *First*

*Illinois Bank & Trust v. Galuska*, 255 Ill. App. 3d 86, 90 (1993). In *Avenaim v. Lubecke*, 347 Ill. App. 3d 855, 862 (2004), the court found four general categories of claims that are germane to the issue of possession:

> "(1) claims asserting a paramount right of possession; (2) claims denying the breach of the agreement vesting possession in the plaintiff; (3) claims challenging the validity or enforceability of the agreement on which the plaintiff bases the right to possession; or (4) claims questioning the plaintiff's motivation for bringing the action." (Internal quotation marks omitted.)

See also *American National Bank v. Powell*, 293 Ill. App. 3d 1033, 1044 (1997).

¶ 24 Accordingly, Illinois courts have consistently held that a claim that seeks damages and not possession is not germane to the purpose of a forcible entry and detainer proceeding. *Sawyier v. Young*, 198 Ill. App. 3d 1047, 1053 (1990) (holding that a counterclaim, unrelated to the question of possession, that solely sought money damages based on a real estate contract was not germane to the forcible action); *Great American Federal Savings & Loan Ass'n v. Grivas*, 137 Ill. App. 3d 267, 275 (1985) (finding that the remaining count of defendant's counterclaim sought damages for plaintiffs' alleged fraud and deceit, and therefore did not concern the issue of possession); *Bismarck Hotel Co.*, 92 Ill. App. 3d at 174 (stating that claims involving fraud are insufficiently germane to a forcible entry and detainer action, as "there is no nexus between the claim and the issue of which party is entitled to possession"); *Wells Fargo Bank, N.A. v. Watson*, 2012 IL App (3d) 110930, ¶ 16 (holding that an issue of whether a party committed fraud on the court in obtaining a mortgage foreclosure judgment was not germane to a forcible entry and detainer action).

¶ 25 Thera argues that these cases are distinguishable because his claim for damages is premised on his right of possession. Specifically, he lost profits from his business because Milton wrongfully denied him possession of the leased premises. Therefore, he asserts that his damages are germane to the purpose of the forcible entry and detainer proceeding.

¶ 26 This court rejected a similar claim in *Powell*, 293 Ill. App. 3d 1033. The landlord in *Powell* brought a forcible entry and detainer action against a tenant. The tenant filed a counterclaim for breach of the implied warranty of habitability and sought a refund of overpaid rent. *Id.* at 1037. Although the court acknowledged that a breach of the implied warranty of habitability is by itself germane to the issue of possession, because the claim for breach was coupled with a request for monetary damages, it was no longer germane. *Id.* at 1045.

¶ 27 Similarly, Thera's counterclaim for lost profits, although premised on his right of possession, is outside the scope of the Forcible Entry and Detainer Act because it seeks monetary damages.[4] Accordingly, the trial court's judgment for Thera on his counterclaim must be vacated.

¶ 28 That said, we sympathize with Thera's position. Milton, bent on gaining possession of the premises and sabotaging Thera's business, openly flouted several of the trial court's orders. If there was an argument to be made for expanding the scope of issues "germane" to a forcible proceeding, this case would provide compelling support.

---

[4]We note that Milton's fraud claim, in which she sought $1425 in unpaid rent, was likewise outside the scope of the Forcible Entry and Detainer Act, although, in any event, the court found that no fraud occurred.

¶ 29     Yet, if forcible proceedings are to retain their summary nature, they cannot be burdened by issues that typically would entail motion practice, discovery, and perhaps expert testimony. And the entry of a money judgment against a litigant in the context of these summary proceedings poses serious due process concerns.

¶ 30     Ultimately, a litigant in Thera's position has the remedies of indirect civil or criminal contempt to (i) compel compliance with the forcible entry court's orders or (ii) punish the willful disobedience of those orders. In addition, Thera can pursue a claim for damages against Milton. And apart from the procedural irregularities in connection with the petitions for rule to show cause discussed below, we express no view regarding the trial court's decision to allow Thera to set off against rent due under the lease any amounts awarded as attorney fees or other costs associated with Milton's noncompliance with court orders.

¶ 31                                  Contempt of Court

¶ 32     Milton next argues that the circuit court's judgment awarding Thera attorney fees and costs should be vacated because she was denied procedural due process in the contempt proceedings related to the October 21, 2016, order that reserved attorney fees and costs as a remedy and the March 16, 2017, judgment that ultimately granted Thera repair costs, attorney fees, and costs. She contends she was deprived of due process because the circuit court did not issue a rule to show cause, nor did it hold a hearing to allow Milton to present evidence in her own defense, before it awarded Thera relief in its March 16, 2017, order. We agree that Milton's procedural due process rights were violated as they relate to the March 16 order and that, as a result, the findings of contempt must be vacated.[5]

¶ 33     We preface our discussion of the many procedural irregularities in the circuit court's contempt proceedings by observing that, as noted above, Milton was an utterly noncompliant and difficult litigant who openly flouted numerous court orders. And even in a summary forcible entry proceeding, a trial court necessarily possesses the ability to compel compliance with its orders. *D'Agostino v. Lynch*, 382 Ill. App. 3d 960, 968 (2008). But contempt proceedings are *sui generis* and require careful adherence to well-established procedures and safeguards to preserve the alleged contemnor's right to due process.

¶ 34     Contempt may be either civil or criminal, and either direct or indirect, with varying due process requirements depending on the classification. *People v. Javaras*, 51 Ill. 2d 296, 299 (1972); see generally *In re Marriage of Betts*, 200 Ill. App. 3d 26, 43-48 (1990).

¶ 35     Whether contempt is civil or criminal turns on the purpose of the contempt charge. *Betts*, 200 Ill. App. 3d at 43; *Emery v. Northeast Illinois Regional Transportation Co.*, 374 Ill. App. 3d 974, 977 (2007). Criminal contempt is used to punish past contumacious conduct, including "an act committed against the majesty of the law in disrespect of the court or its process" (*Pryweller v. Pryweller*, 218 Ill. App. 3d 619, 629 (1991)), whereas civil contempt is used as a means to compel compliance with a court order, usually "for the benefit or advantage of another party to the proceeding" (*id.* at 628). See *Betts*, 200 Ill. App. 3d at 43; *Felzak v. Hruby*, 226 Ill. 2d 382, 391 (2007). Civil contempt proceedings are "avoidable through obedience," and an alleged contemnor must be able to "purge" a civil contempt charge by complying with

_____

[5]Milton does not challenge the trial court's supplemental judgment on May 23, 2017, granting Thera $7492 in attorney fees and compensation for stolen property. Accordingly, we do not consider the propriety of that judgment.

the order the court sought to enforce. *People v. Warren*, 173 Ill. 2d 348, 368 (1996); *In re Marriage of Sharp*, 369 Ill. App. 3d 271, 279 (2006); *Felzak*, 226 Ill. 2d at 391.

¶ 36        Contempt, whether civil or criminal, may be direct or indirect. The distinction between direct and indirect contempt largely depends on where the contumacious conduct took place. See *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 41 (2010). Direct contempt occurs in the judge's presence or in an "integral or constituent part of the court." *Betts*, 200 Ill. App. 3d at 48; *Javaras*, 51 Ill. 2d at 299. All other contempt is indirect and "must be established by the presentation of evidence." *Wierzbicki v. Gleason*, 388 Ill. App. 3d 921, 934 (2009); *Javaras*, 51 Ill. 2d at 300; *Betts*, 200 Ill. App. 3d at 48; *Bank of America, N.A. v. Freed*, 2012 IL App (1st) 113178, ¶ 20. "A finding of indirect civil contempt relies on the existence of a court order and willful disobedience of that court order." *Sinkus v. BTE Consulting*, 2017 IL App (1st) 152135, ¶ 29.

¶ 37        Milton's conduct was obviously not committed in the court's presence and so was indirect. It is less clear whether her contempt was civil, criminal, or both, particularly since the trial court made no attempt to designate the form of contempt at issue. In its October 21, 2016, order granting Thera's first petition for a rule to show cause, the trial court directed Milton to complete the work by November 30, suggesting that the contempt was intended as civil. *Pryweller*, 218 Ill. App. 3d at 628 (civil contempt is a means to compel compliance with a court order, typically for the benefit of another party). Additionally, issuance of a rule to show cause is appropriate only in civil contempt. *Betts*, 200 Ill. App. 3d at 58-59 (because a respondent in indirect criminal contempt proceedings has a right against self-incrimination, she cannot be required to "show cause" as to why she should not be held in contempt). But the court never provided Milton with a way to purge her contempt, either in its October 21, 2016, order or in its March 16, 2017, order in which it awarded Thera repair costs, court costs, and attorney fees. Moreover, the record is unclear as to whether Milton had completed the work before the court's March 16, 2017, order. See *In re J.L.D.*, 178 Ill. App. 3d 1025, 1031 (1989) (contempt was criminal where respondent "was not given the opportunity to purge the contempt, nor could she have since the act had already been done and corrected"); *In re Marriage of O'Malley*, 2016 IL App (1st) 151118, ¶¶ 28-29 (where contemnor complied with court order prior to court's finding of "indirect civil contempt," the contempt was properly classified as indirect criminal contempt, since contemnor had no way to purge the contempt).

¶ 38        But regardless of whether the contempt is classified as civil or criminal, the trial court failed to provide Milton with the due process required for an adjudication of indirect contempt. Because judges in indirect contempt proceedings do not have personal knowledge of the allegedly contumacious conduct, the contemnor cannot be punished summarily. *Pryweller*, 218 Ill. App. 3d at 629. Rather, due process requires that the contemnor receive (i) an evidentiary hearing and (ii) adequate notice of the time and place of such hearing. *Id.*; see also *Betts*, 200 Ill. App. 3d at 52-53 (in civil contempt, the contemnor is entitled to minimal due process, consisting of notice and an opportunity to be heard; in criminal contempt, in addition to the foregoing, the contemnor is also entitled to procedural safeguards normally applicable to criminal trials, such as the right to counsel and the right to be proved guilty beyond a reasonable doubt). Milton argues that she received neither. We agree.

¶ 39        Notice of an indirect civil contempt proceeding must (i) "contain an adequate description of the facts on which the contempt charge is based" and (ii) "inform the alleged contemnor of the time and place of an evidentiary hearing on the charge within a reasonable time in advance

of the hearing." (Internal quotation marks omitted.) *City of Quincy v. Weinberg*, 363 Ill. App. 3d 654, 664 (2006); see also *In re Parentage of Melton*, 321 Ill. App. 3d 823, 829 (2001). The petition for rule to show cause and rule to show cause work in concert to notify the alleged contemnor of the charges against her and the time and place of an evidentiary hearing. *In re Marriage of LaTour*, 241 Ill. App. 3d 500, 508 (1993). A party's petition for a rule to show cause typically initiates civil contempt proceedings, but the court must also issue a rule to show cause to satisfy notice requirements. *Id.* at 508; *Betts*, 200 Ill. App. 3d at 53. The rule to show cause is "the method by which the court brings the parties before it for a hearing"; it is not itself a contempt finding. *LaTour*, 241 Ill. App. 3d at 507.

¶ 40 When a court fails to issue a rule to show cause and serve it on the alleged contemnor prior to holding her in indirect civil contempt, the court deprives her of due process because she lacks proper notice of the contempt proceeding. See *People ex rel. Williams v. Williams*, 156 Ill. App. 3d 438, 442 (1987); *Sanders v. Shephard*, 185 Ill. App. 3d 719, 730-31 (1989). For instance, *Williams* held that an alleged contemnor did not have adequate notice where a rule to show cause was filed, defendant was held in contempt, the contempt was purged, and then no new petition for rule to show cause was filed, and no new rule to show cause was issued before the defendant was found in indirect civil contempt at a later hearing. *Williams*, 156 Ill. App. 3d at 443. Defendant believed the hearing was in regard to a motion to modify an order for support, the only motion pending before the court at that time, and was never given notice that the hearing would concern his alleged contempt. *Id.* at 441-43. Similarly, in *Sanders*, 185 Ill. App. 3d at 722-23, 730-31, notice requirements were not met when the court issued an emergency *ex parte* order of protection directing a father to produce his child in court on a certain date stating, " 'Willful violation of any provisions of this order constitutes contempt of court and may further result in fine or imprisonment.' " At the hearing when the father was to produce the child, the father failed to do so. The mother presented a petition for rule to show cause to the court, and the court held a contempt hearing *instanter*, finding the father in civil contempt. *Id.* at 723.

¶ 41 Here, Milton was not informed of the charges against her by "information, notice or rule to show cause" before the court essentially granted Thera relief by awarding attorney fees and costs to be determined at a later date. *Williams*, 156 Ill. App. 3d at 442. Although Thera's petition for rule to show cause initiated the contempt proceedings and likely informed Milton of the facts upon which the charge was based, the record reveals that the October 21, 2016, hearing was described as a hearing seeking the issuance of a rule to show cause, not a hearing on a rule to show cause issued by the court. Milton would have been on notice that the October 21, 2016, hearing concerned whether the court should issue a rule to show cause, not whether Milton should be held in indirect civil contempt. When the court simultaneously "entered" a rule to show cause and awarded Thera attorney fees and costs, it confused two distinct procedures: issuing a rule to show cause and finding a party in contempt. Thus, Milton was never informed of the time and place of an evidentiary hearing, as is required. *Weinberg*, 363 Ill. App. 3d at 664; *Melton*, 321 Ill. App. 3d at 851.

¶ 42 At no point between the time Thera filed his September 13, 2016, petition for rule to show cause and the court's October 21, 2016, order did the court issue or serve a rule to show cause or in any way notify Milton of the possibility that the court would award Thera relief at that time. Like the respondents in *Williams* and *Sanders*, Milton had no reason to believe the October 21, 2016, hearing would concern whether she should be found in contempt or that

- 10 -

Thera's entitlement to attorney fees would be determined when she came to court that day. Because the court failed to issue a rule to show cause based on Thera's September 13, 2016, petition and serve it upon Milton before granting Thera relief, Milton did not receive adequate notice and was deprived of due process in the first contempt proceeding.

¶ 43 As for Thera's second petition for rule to show cause filed on January 24, 2017, Milton was apprised of the facts upon which the contempt charge was based through Thera's second petition for rule to show cause. But the court failed to either notify Milton of the hearing on the petition or issue a rule to show cause. Like *Williams*, here there was no rule to show cause pending before the court upon which it could base an award of attorney fees. Therefore, because the process relating to the second contempt petition was defective, the trial court's order must be vacated.

¶ 44 Moreover, this lack of proper notice also effectively deprived Milton of a fair hearing. "[I]n order to find a defendant guilty of indirect contempt of court, 'due process requires that the defendant [not only] be advised of the charges, [but also] be accorded a fair hearing.' " *Williams*, 156 Ill. App. 3d at 442 (quoting *People v. Edwards*, 69 Ill. App. 3d 626, 628 (1979)). It is not enough that the contemnor be allowed to testify and to cross-examine the other party's witnesses (*id.* at 443); rather, she must be allowed to present evidence on her own behalf, so that she has "a full opportunity for explanation for noncompliance." *Pryweller*, 218 Ill. App. 3d at 631. This entails " 'the opportunity to show that the version of the event related to the judge was inaccurate, misleading, or incomplete.' " *People v. Jashunsky*, 51 Ill. 2d 220, 225 (1972) (quoting *Johnson v. Mississippi*, 403 U.S. 212, 215 (1971)).

¶ 45 In its October 21, 2016, order, the circuit court simultaneously and improperly "entered" a rule to show cause and "reserved" attorney fees and costs. Accordingly, Milton had no opportunity to present evidence to explain her noncompliance with the July 28, 2016, order before the court granted remedies. Additionally, Milton was denied the opportunity to be heard before the court's March 16, 2017, judgment granting attorney fees and costs to Thera. The record does not reflect that Milton was afforded the opportunity to explain her noncompliance with the October 21, 2016, order at the March 16, 2017, hearing before the court awarded attorney fees and costs, as there was no mention of the petition for rule to show cause in the proceeding. Even if the petition for rule to show cause had been mentioned in the proceeding, there was still no rule to show cause issued before the court awarded attorney fees. Thus, the March 16, 2017, hearing would have concerned whether a rule to show cause should be entered, not whether Milton should be held in contempt. Thus, the court denied Milton the opportunity to be heard on whether she should be found in contempt before it granted Thera attorney fees and costs.

¶ 46 Furthermore, although the parties do not raise this issue, we observe that the trial court did not enter a valid contempt order against Milton. See *Emery*, 374 Ill. App. 3d at 978 (civil contempt order was invalid where the order failed to specify whether the contempt was civil or criminal and failed to identify the contumacious conduct with specificity). Indeed, the court never explicitly entered a finding of contempt against Milton; in its October 21, 2016, order, the court purportedly entered a rule to show cause against Milton, while in its March 16, 2017, order, the court awarded attorney fees and costs to Thera without making any finding of contempt or reciting the factual basis on which any such finding was premised.

¶ 47 Accordingly, the court's March 16, 2017, award of attorney fees, court costs, and repair costs to Thera must be vacated.

¶ 48                                      CONCLUSION

¶ 49          We affirm the trial court's judgment for Thera on the forcible entry and detainer and fraud counts of Milton's complaint. We vacate the court's judgment in favor of Thera on his counterclaim for lost profits because it was outside the proper scope of a forcible entry and detainer action, and to permit Thera on remand to proceed with the claim for damages without the need to refile, we direct the court to sever the counterclaim and send it to the appropriate division of the circuit court. We additionally vacate the court's March 16, 2017, award to Thera of "repair costs of $2,953, court costs, lost income, and attorney's fees," since Milton was not given due process in connection with the contempt proceedings. If, on remand, Thera wishes to pursue a charge of indirect criminal contempt against Milton for her failure to comply with the court's July 28 and October 21, 2016, orders in a timely fashion, he may do so, but all procedural safeguards associated with an indirect criminal contempt proceeding, as described above, must be followed.

¶ 50          Affirmed in part, vacated in part, and remanded with instructions.